THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTONIO REYES, Defendant-Appellant.

First District (2nd Division) No. 1—86—3195

Opinion filed March 28, 1989.

Michael J. Pelletier and Karen Daniel, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund, Linda Woloshin, and William B. Schiller, Assistant State's Attorneys, of counsel), for the People.

248

PRESIDING JUSTICE EGAN delivered the opinion of the court:

The defendant, Antonio Reyes, and Jose Hernandez were indicted for armed robbery, armed violence, unlawful restraint, aggravated kidnapping and separate counts of murder, including intentional murder, killing in the commission of a forcible felony and stabbing the victim, knowing that such action would cause strong probability of death. Hernandez pleaded guilty to intentional murder, armed robbery and aggravated kidnapping and was sentenced to concurrent terms of 35 years for murder and 30 years for armed robbery and aggravated kidnapping. The defendant was convicted by a jury of armed robbery, felony murder and stabbing the victim knowing that it would cause strong probability of death. His defense was insanity. The judge indicated he would not impose the death penalty, and the defendant waived his right to a jury for sentencing. The judge found that the defendant was eligible for the death penalty but, because of the mitigating factor of diminished mental ability, he sentenced him to a term of natural life imprisonment.

Judy Benson, the girlfriend of Hernandez, testified that on August 14 and 15, 1984, the defendant and Hernandez discussed plans to steal a car in order to drive to Idaho to avoid pending criminal charges. On August 16 at 10 a.m., the defendant and Hernandez met Benson. The three went to a resale store where both Hernandez and the defendant made purchases. They stopped at the San Antonio Bar in Chicago, where the defendant changed his shirt and shoes and discarded his old clothes in the alley. The three spent the day together, returning to an area of Chicago called "Greek Town" about 6 p.m. Benson left and rejoined them between 7 p.m. and 8:30 p.m. at the van in which defendant and Hernandez were living. The two men were drinking; Benson observed that they had a six-pack of malt liquor beer, of which two cans had been opened; however, neither man seemed intoxicated.

The defendant said that "tonight is the night we're going to do it. We're going to get a—we're going to leave." Hernandez took Benson's purse and showed the defendant Benson's driver's license, apparently to show that Benson could lawfully drive a vehicle. Pursuant to Hernandez' instructions, Benson went home, changed and returned to the van about one hour later. The defendant again stated that they were going to steal a car, hot wire a car or highjack a cab, but Benson refused to participate. Benson and Hernandez stepped away from the defendant, and Hernandez threatened to kill her if she refused to cooperate. Benson again refused, noting that she was pregnant with his child.

The three went to the corner of Gladys and Halsted, and Hernandez flagged down a cab. He refused to enter the cab because he knew the driver. Both Hernandez and the defendant stated that they had to catch another cab. The defendant said that they would have to "get rid of the driver" and that "we'll kill the mother-fucker if we have to." They then flagged down another cab, a Checker cab, and got in. Hernandez was carrying a red duffle bag in which he had placed a knife with a wooden handle and a six-inch blade. It was called a "pro-throw" knife.

The defendant gave a statement to Assistant State's Attorney Dane Cleven which was recorded by a stenographer, transcribed and signed by the defendant. In that statement the defendant said the following: He and Hernandez entered into the back of a cab driven by Dennis Reilly and told him to drive south on Western Avenue. The defendant then told Reilly to make the first right turn, which led into a dark industrial area at 3230 South Western Avenue. Hernandez handed the defendant a knife, although the defendant could not remember whether it was the pro-throw knife. He also handed the defendant his wallet in order to give the driver the impression that the defendant was going to pay the fare. The defendant then handed the wallet back to Hernandez and grabbed the driver by the neck. He recalled that there was a struggle and that the driver was stabbed when he reached for a knife under his seat. The defendant could not remember whether he stabbed the driver. After he was stabbed, the driver got out of the cab, and the defendant got in the driver's seat while Hernandez got in the front passenger seat. The cab driver had given the defendant his money during the struggle. The defendant then drove the cab out of the area. He and Hernandez had intended to drive to Idaho but got lost and wound up in Indiana. At the Indiana State line, Hernandez wanted to drive, so he and the defendant switched places.

Dennis Reilly's body was discovered in the roadway of 3230 South Western Avenue by Officer John Tedesco. He observed a large blood stain in the center of the victim's face, nose, mouth and left wrist. The autopsy revealed stab wounds to the chest and wrist as well as multiple abrasions on the victim's face and knees. The stab wound to the chest lacerated the heart.

The defendant and Hernandez were arrested in the cab later that night in Indiana after a high-speed chase which ended when Trooper Michael Greene bumped the cab off the road. Trooper Richard Dick observed what appeared to be blood on the driver's door. He saw a book with a knife handle sticking out. He also retrieved a red duffle

bag. The duffle bag was later opened and found to contain personal items and approximately $7 in nickels, dimes and quarters. At the jail the troopers confiscated the defendant's clothes and found $77 in one of the defendant's shoes. Subsequent tests performed by the Chicago police crime laboratory showed that Reilly's blood was on the defendant's trousers. Fingerprints lifted from the left inside rear-view mirror of the cab were identified as those of the defendant and Hernandez.

The defendant first called Indiana Trooper Dick, who testified that at approximately 4:35 a.m. on August 17, he read the defendant his rights off an advice-of-rights interrogation form, which the defendant appeared to understand. The defendant refused to sign the bottom portion of the form. Dick also stated that the defendant did not appear to be intoxicated and did not mention that he had been sniffing paint that day.

The defendant's sister, Angela Reyes, one year older than he, testified about his family life. Their mother ran off after the defendant was born and their father remarried. The father constantly beat the children and yelled at the defendant, calling him names and telling him that he was no good. When the defendant turned 12 or 13, his personality underwent a change, and he became sad, emotionally disturbed and exhibited low self-esteem. He was also getting high on sniffing paint every day, after which he would come home and sit and stare while his father stared at him. He reported to his sister that he saw Jesus and heard humming sounds while he prayed. He dropped out of school in 1978, at the beginning of his second year of high school, because of his fear of street gangs. She testified that her brother's condition deteriorated, and sometimes after his father yelled at him, the defendant would break windows and doors. He began sleeping in alleys after getting high from paint-sniffing. When the police found him they would take him to a hospital, and from there he would be sent to a mental hospital or a veteran's hospital. His father refused to let him come home until the police insisted. The defendant's father and stepmother moved to Texas soon after the defendant's arrest in this case. When the defendant joined the army and was sent overseas to Germany, his sister lost track of him.

The defendant had entered the army in 1979 and received a general discharge in 1981 for psychological reasons after he was caught sniffing paint and after he had assaulted his sergeant.

Albert Pawlowski, a drug rehabilitation technician at the Veteran's Administration Medical Center in Chicago, testified that he first met the defendant in February 1982 when the defendant volun-

tarily entered a rehabilitation program after admitting to sniffing paint and using phencyclidine (PCP) for four to five years. The defendant stayed in the program for two months. Pawlowski next met the defendant over a year later, in July 1983, in the "detox" unit of the Veteran's Administration Medical Center, where the defendant had gone voluntarily. The defendant remained in the program for seven months. He described the defendant's behavior as passive, withdrawn and timid, which was characteristic of paint or PCP abusers. However, the defendant was given a high level of responsibility as a cook in the program and was able to follow the rules. He voluntarily left the program February 8, 1984, while in the second phase, although the medical staff advised him that he was not ready to leave.

Dr. Leonard Koziol, a clinical psychologist, evaluated the defendant in May 1986 at the Cook County jail. He reviewed the police reports, psychiatric treatment reports from the defendant's prior hospital admissions and family history and interviewed the defendant for 4½ hours. He concluded that the defendant had an organic mental disorder. The defendant's IQ was 80, 29 points lower than his score in 1979, from which Dr. Koziol concluded that the defendant's chronic paint-sniffing had resulted in deterioration of his functioning. He also concluded that the defendant had self-destructive behavior, as exhibited by his history of paint-sniffing, frequent inability to care for himself physically and his numerous suicide attempts. On cross-examination Dr. Koziol admitted that the defendant's alleged suicide attempt where he lay "in front of a train on railroad tracks" but did not kill himself because the train was going too slow could have been an act of "manipulation." He felt that the defendant's impairment could have been caused by chronic paint inhalation, the effect of which would include impairment of judgment and impulsive behavior. He was also of the opinion that at the time of the killing, the defendant was incapable of conforming his conduct to the requirements of the law. The defendant was "insane" at the time of the killing, although the defendant's flow of thought was classified as normal in the Cermak Health Service Report performed at the time of the defendant's arrest. Further, while "at a basic primitive level" the defendant could have had a fundamental awareness of the criminality of his actions, his understanding would have deteriorated when he was under the influence of intoxicants.

Two psychiatrists testified in rebuttal. Dr. Gilbert Bogen, from the Psychiatric Institute, examined the defendant on two separate occasions in April and May 1986. He testified that there were no abnormal findings in the brain scan. He also examined the defendant's psy-

chological records as well as police reports and statements. He concluded that the defendant suffered from an anti-social personality disorder and substance abuse. Lying was an example of anti-social behavior. Bogen concluded that the defendant was lying when he stated that he had been drinking and sniffing paint at the time of the offense. He disagreed with the defense expert, Dr. Koziol, and stated that the defendant exhibited purposeful behavior in committing the offense, for example, when the defendant pretended to pay for the fare in order not to alarm the driver. Dr. Bogen also concluded that the defendant did not suffer from any mental defect, disease or illness and was "sane" at the time of the offense.

Dr. Werner Tuteur examined the defendant twice in June of 1986. He agreed that the defendant's EEG and brain scan did not show any abnormalities and that the defendant was not intoxicated at the time of the offense. He saw no mental diseases in the defendant and concluded that the defendant was able to form intent, was aware of the criminality of his acts and could live up to the requirements of the law.

The defendant's first contention is that all pretrial statements should have been suppressed. His argument hinges on what transpired shortly after his arrest by Indiana police officers.

At about midnight, Indiana State Trooper Richard Dick saw the defendant and Hernandez in the Checker cab at Route 2 and Route 55 in a rural area near Lowell, Indiana. Dick found it peculiar that a City of Chicago cab would be traveling in that remote area. Further observation revealed erratic driving when the cab stopped at a flashing yellow light and also hit the curb in an entrance to Interstate 65. After following the cab for a few more miles, Dick decided to stop it. Once the cab was stopped in a passing lane on Interstate 65, Dick ordered the vehicle onto a grassy area along the road. The driver did not comply with Dick's orders, and when he approached the cab, the cab took off and continued along I-65 at a high rate of speed. At that point a chase ensued with speeds reaching up to 100 miles per hour. After Dick radioed for assistance, Trooper Michael Greene also became involved in the chase, and in an effort to stop the cab, performed a "rolling block" with his squad car. The cab struck Greene's squad car, sending it spinning in front of an on-coming semitrailer. After recovering, Greene rejoined the high-speed chase. The cab next attempted to exit the interstate onto U.S. Route 24. However, Greene caught up with the cab and, using his already damaged squad car, ran the cab into a ditch.

Dick approached the cab and ordered the passengers out. The

defendant was sitting in the passenger seat, and when he did not get out of the cab, Dick assisted him. The defendant and Hernandez were placed under arrest at approximately 12:30 a.m. on August 17. Dick testified that he read the defendant his constitutional rights and that the defendant said he acknowledged and understood those rights and wished to waive them. They then engaged in a short conversation. The defendant did not appear to be intoxicated, did not stagger, his eyes were not bloodshot, he did not make any complaint at that time and there was no odor of alcohol on his breath. According to Dick the defendant did not ask to speak to an attorney. He did observe that the defendant had several sores on his legs, which the defendant said had been there for some time. He was taken to a local hospital for treatment of those sores. At that time none of the Indiana police officers had any knowledge of the killing of Dennis Reilly.

At approximately 4:30 a.m., after the defendant was taken to the Jasper County jail, he had a conversation with Troopers Dick and Ludlow. Ludlow testified that he advised the defendant of his rights, reading from an advice-of-rights interrogation form. The defendant said he did not wish to sign the form and did not wish to make a statement at that time. Questioning ceased, and Ludlow noted on the form that at 4:37 a.m., the defendant "refused to sign" the form. Both troopers then signed the form as witnesses. Dick said the defendant did not ask to speak with an attorney.

Detective Richard Bedran of the Chicago police department was assigned to investigate the murder of Dennis Reilly. In the early morning of August 17, he received a teletype message from Indiana, stating that the authorities there had a Checker cab and two men in custody. After telling the Indiana authorities to keep the two in custody for a homicide investigation, Bedran drove to Jasper County with Detective John Herman.

At approximately 5:30 a.m. the defendant was brought to a conference room. Present were Troopers Dick and Ludlow and Chicago Officers Herman and Bedran. Bedran told the defendant they were investigating the homicide of a cab driver. The defendant was then advised of his rights by Herman, who read from a preprinted police department book. After Herman went through the rights one by one, the defendant stated that he understood each of those rights and wished to answer questions at that time. He said that he had caught a cab with Hernandez and that Hernandez had a knife. While in the cab, he found the knife but he had been drinking and did not remember any more. He said that he did not have any money when he got in the cab and he did not remember anybody stabbing the cab driver. Be-

dran observed that during this conversation the defendant was responsive to the questions asked, did not smell of alcohol, did not say he was drunk or high on paint and did not claim to have any problems in answering the questions.

Later that morning, after an extradition hearing, the Chicago police officers left Indiana with the defendant and Hernandez, arriving at Area 3 Violent Crimes headquarters in Chicago at approximately noon. The State's Attorney's office was notified, and at approximately 1:30 that afternoon, the defendant was brought into an interview room where he met Assistant State's Attorney Dane Cleven.

Cleven testified that he introduced himself, saying he was an assistant State's Attorney. He then advised the defendant of his rights after which the defendant agreed to speak to him. At approximately 3:38 p.m. he had another conversation with the defendant in the presence of Bedran and a court reporter. He again gave the defendant his rights and questioned him concerning the Dennis Reilly killing. During the questioning, which lasted about 10 minutes, the defendant never complained that he needed to use the washroom, nor did he ask for anything to drink. He said that he had no complaint about the way the police had treated him, and he also told Cleven that he was able to read and write. The defendant did not have a problem understanding the questions, was responsive and alert. After the court reporter transcribed his notes, the defendant was given a copy to make corrections. He pointed out several errors which were corrected. Among the errors he corrected were the spelling of his name, the spelling of the word "location," the name of Hernandez' girlfriend and the changing of the type of knife used in the offense from "crow-throw" to "pro-throw." After making corrections he signed the statement.

Officers Bedran and Herman both testified that while in Indiana they did not see the interrogation form which the defendant refused to sign. Neither officer was asked whether he was aware of the fact that the defendant had told Dick that he did not wish to make a statement at that time. Bedran testified that none of the Indiana officers told him that the defendant requested an attorney. He said that at no time during the conversation did the defendant say he did not wish to discuss the case or did he ask to speak with an attorney before proceeding.

The defendant testified that he repeatedly invoked his rights to remain silent and to speak to an attorney before answering questions. He said that he suffers memory loss and delusions as an effect of years of inhaling paint and that he was "pretty sure [he] was passed out" just before he was arrested. He did not remember the first con-

versation with Dick. After he was taken to the station, he told the Indiana officers he had nothing to say and wanted to speak to an attorney. He also remembered that he refused to sign the waiver form.

He could not recall if Officers Bedran and Herman advised him of his rights, but he did tell them he wanted to speak with an attorney. He did not remember being advised of his rights after arriving in Chicago, but again he asked for an attorney.

He said that he agreed to speak to Cleven, because Cleven told him he was a lawyer and he believed that Cleven was his lawyer. He denied that the police officers were present during the first interview and denied that Cleven gave him his *Miranda* warnings during the initial interview or identified himself as an assistant State's Attorney. The second interview, when the court reporter and police officer were present, was not "confidential" and Cleven's demeanor and attitude became less friendly. He read over the typewritten statement, including the portion that stated he had been advised of his rights and that Cleven was an assistant State's Attorney, and pointed out errors. He said that Cleven and the police officer yelled at him and threatened him. An officer struck him in the head, and he then agreed to sign the statement.

The linchpin of the defendant's argument is the fact that the defendant initially told the Indiana officers he did not wish to make a statement at that time. He concedes that *Michigan v. Mosley* (1975), 423 U.S. 96, 46 L. Ed. 2d 313, 96 S. Ct. 321, holds that an initial refusal to answer questions is not an absolute bar to the admissibility of any subsequent statements. But he argues that these facts do not meet the test of *Mosley,* because in that case the subsequent questioning concerned an offense unrelated to the crime for which the defendant had been first interrogated. The defendant's argument has been rejected in *People v. Foster* (1987), 119 Ill. 2d 69, 518 N.E.2d 82, in which the supreme court held that requestioning of a defendant about the same crime does not preclude a finding that an accused's right to remain silent was "scrupulously honored" as required by *Mosley.*

■ Factors to be considered in determining admissibility of a statement made after an initial refusal to make one are whether there was a significant period of time between the defendant's exercise of his right to remain silent and the requestioning; whether the requestioning was preceded by *Miranda* warnings; and whether a different officer conducted the second questioning. (*People v. Faison* (1979), 78 Ill. App. 3d 911, 397 N.E.2d 1233.) Voluntariness is determined by consideration of the totality of the circumstances. *People v. Fleming* (1981), 103 Ill. App. 3d 194, 431 N.E.2d 16.

We do not believe that it may be said, as a matter of law, that the 55-minute interval between the questioning by the Indiana police and questioning by the Chicago police was an insignificant period of time. (The following cases have found the lapse of time to be significant: *People v. Ferguson* (1981), 102 Ill. App. 3d 702, 429 N.E.2d 1321 (50 minutes); *People v. Young* (1983), 115 Ill. App. 3d 455, 450 N.E.2d 947 (75 minutes); *People v. Pleasant* (1980), 88 Ill. App. 3d 984, 411 N.E.2d 132 (90 minutes).) The requestioning was preceded by *Miranda* warnings, and although the two Indiana troopers were present during the second interrogation, they did not ask any questions. The fact that different personnel conducted the requestioning supports the determination that the defendant's rights were scrupulously honored. *People v. Young* (1983), 115 Ill. App. 3d 455, 450 N.E.2d 947.

Contrary to the defendant's assertion, there is no evidence that the police attempted to "wear down" his resistance. There is no evidence that he "lost an entire night's sleep," nor any evidence that he was exhausted or complained of lack of sleep. In addition, in refusing to answer the questions of Troopers Dick and Ludlow, the defendant stated that he did wish to do so "at that time." Such a qualification, it may be inferred, invited subsequent questioning to determine whether the defendant wished to continue to be silent, particularly since the defendant had told Dick, when first arrested, that he wished to waive his rights.

The defendant relies principally on *People v. Savory* (1980), 82 Ill. App. 3d 767, 403 N.E.2d 118, in which a divided appellate court reversed a murder conviction, holding that the defendant's statement did not meet the requirements of *Miranda* and *Mosley*. *Savory* involved a 14-year-old defendant who at the outset told the police he did not want to talk. The police convinced him to talk. The police discovered discrepancies in his story and questioned him about them. A polygraph test was given. Again he said he did not want to talk. He was held overnight and reinterrogated the following day. He was read his rights again and denied any wrongdoing. Later that day he was reinterrogated and questioned for over four hours. He was given another polygraph examination. The majority of the appellate court emphasized the defendant's age as well as the length of the custodial interrogation. Factually, the case is not apposite.

■ ■ It was the function of the trial judge to determine the credibility of the witnesses. He need not have been convinced beyond a reasonable doubt as to voluntariness of the statements made by the defendant, and his finding of voluntariness will not be disturbed on

review unless contrary to the manifest weight of the evidence. We judge that his finding was not contrary to the manifest weight of the evidence.

The defendant next contends that the trial court's refusal to ask questions of individual jurors constituted reversible error under *People v. Zehr* (1984), 103 Ill. 2d 472, 469 N.E.2d 1062.

Before the jury selection began, the defendant filed a set of questions to be asked individually of the prospective jurors. They included the following:

"1. If Antonio Reyes decides not to testify on his own behalf, would you hold it against him?

2. Do you understand that Antonio Reyes is presumed to be innocent of these charges against him and that that presumption of innocence continues throughout jury selection, throughout the presentation of evidence, throughout every stage of this trial and into the jury room through deliberations? Do you agree with that law or disagree?

3. Do you understand that Antonio Reyes does not have to offer any evidence in his own behalf, but instead must be proven guilty beyond a reasonable doubt by the prosecution?

4. If you believe at the conclusion of all the evidence in this case and after I have instructed you as to the law that you must apply, that the prosecution has not proved each and every element of the charges against Antonio Reyes beyond a reasonable doubt, can you and will you return to this courtroom with a verdict of not guilty?"

The judge denied the defense motion for individual questioning but held that the proffered questions would be asked of the prospective jurors, although not necessarily in the precise form tendered by the defense.

The judge explained the jury process to the 50 prospective jurors and read the charges against the defendant. He then addressed the entire venire as follows:

"The defendant is charged with the offenses of murder and armed robbery. The defendant has pleaded not guilty. The indictment in this case is the formal method of accusing the defendant of an offense and placing him on trial. It is not any evidence against the defendant, and does not create any inference of guilt. The defendant is presumed to be innocent of the charges against him. This presumption remains with him throughout every stage of the trial and during your deliberations of the verdict, and it is not overcome unless from all the

evidence in the case you are convinced beyond a reasonable doubt that the defendant is guilty.

The State has the burden of proving the guilt of the defendant beyond a reasonable doubt, and this burden remains on the State throughout the case. The defendant is not required to prove his innocence.

The fact that a defendant does not testify should not be considered by you in any way in arriving at your verdict. If you are selected to serve on the jury, it is your duty to determine the facts and to determine them only from the evidence in this case. You are to apply the law to the facts and in this way decide the case."

The judge further addressed the jury, reciting, in effect, standard instructions in all cases, such as the admonition against sympathy and prejudice and concern over the court's rulings on admissibility of evidence. The judge then asked whether any juror "who by virtue of some political ideology or religious or social position" felt that he would not be able to follow the instructions. Only one prospective juror responded; and the court excused her for cause when she revealed that she did not believe that she could be fair because her brother had been killed. Again, the judge asked the following:

"Is there any juror who by virtue of some political, religious or ideological position would, if the State is unable to prove the defendant guilty beyond a reasonable doubt, in other words if the State fails in its burden of proving the defendant guilty beyond a reasonable doubt, is there any juror who would refuse to sign a not guilty verdict? If so, please raise your hands.

If at the conclusion of the case the State has proven the defendant guilty beyond a reasonable doubt is there any juror who would refuse to sign a guilty verdict? If so, please raise your hands.

Again there is no response to either of those questions."

■ The defendant contends, citing *Zehr*, that the judge erred in not asking whether a "personal belief" would prevent a juror from returning a not guilty verdict even though warranted. In our judgment the procedure followed by the trial judge meets the requirements of *People v. Zehr*. There is no need, as the defendant suggests, that the jurors be questioned individually. (*People v. Fox* (1988), 177 Ill. App. 3d 602, 532 N.E.2d 472.) Our reading of *Zehr* discloses no requirement that questions be put to the jurors expressly in the terms of their "personal" belief. We note also that the questions proffered by the defendant were not couched in terms of "personal" beliefs. Fur-

ther, we judge that asking jurors whether any "political ideology or religious or social position" would prevent them from following the court's instruction is sufficiently broad to encompass "personal beliefs" of jurors that would interfere with their ability to follow the court's instruction. It would appear that the jury understood the judge's question to include "personal belief" as evidenced by the fact that one of the jurors responded that she could not be fair because her brother had been murdered several years before.

The defendant raises two arguments concerning this sentence. He asks that his sentence be reduced because of his background and rehabilitative potential and because of the disparity between his sentence of natural life and Hernandez' sentence of 35 years. The defendant concedes that Hernandez did not inflict the fatal stab wound, but he argues that Hernandez was an equal participant in the planning, the commission of the offense and the post-offense actions. Hernandez also had a more serious criminal record, having been convicted of a felony, and he pleaded guilty to intentional murder as well as aggravated kidnapping, while the defendant was found not guilty of intentional murder and he was not tried for aggravated kidnapping.

■ We decline to reduce his sentence. We have considered the cases cited by the defendant in which courts of review have reduced sentences, and we deem none of them to be persuasive here. We have also considered the remarks of the trial judge before sentencing which reflect his conclusion that the defendant would be a great danger to society if released and that he had throughout displayed a complete lack of remorse. He pointed out "the aggravating factor" that the killing was committed in the course of a robbery, and he found that the defendant was the actual killer. He also noted that the defendant was eligible for the death penalty; but, he declined to impose it, because the defendant had "diminished mental capacity" and a criminal record that was "not extensive." We cannot say that the trial judge abused his discretion.

■ Nor can we say that the disparity in the sentences of the defendant and Hernandez is unjustified. It was the defendant who announced beforehand that he planned to get rid of the driver and even kill him. It was he who stabbed the victim even after he had surrendered his wallet. While we are mindful of the cases which have held that a plea of guilty by a codefendant does not, of itself, justify disparate sentences, it is, nonetheless, a factor to be considered. (*People v. Ward* (1986), 113 Ill. 2d 516, 499 N.E.2d 422.) Where one defendant admits wrong and the other does not, and is subsequently convicted, it cannot be maintained that the defendants are similarly situ-

ated with respect to rehabilitative potential. (*People v. King* (1981), 102 Ill. App. 3d 257, 430 N.E.2d 292.) A reviewing court should not substitute its judgment for that of the trial judge merely because it might have balanced the appropriate factors differently if the task of sentencing had been reserved to it. *People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541.

In view of the position we take on the propriety of the sentence, it is not necessary to address the State's argument that the argument had been waived because of the defendant's failure to raise the disparity argument at his sentencing. *Cf. People v. Davis* (1988), 173 Ill. App. 3d 300, 527 N.E.2d 552.

For these reasons the judgment of the circuit court is affirmed.

Judgment affirmed.

HARTMAN and BILANDIC, JJ., concur.