THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
ANTONIO BALDERAS, Defendant-Appellant.

First District (1st Division)   No. 1—89—2332

Opinion filed February 1, 1993.

Michael J. Pelletier and Patricia Unsinn, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Barbara Jones, and Michael Falafario, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'CONNOR delivered the opinion of the court:

Defendant, Antonio Balderas, was indicted for the murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1) of Miguel Rivera, the attempted (Ill. Rev. Stat. 1987, ch. 38, par. 8—4) murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1) of Luis Pagan and the armed robbery (Ill. Rev. Stat. 1987, ch. 38, par. 18—2) of both Pagan and Rivera. At the conclusion of the ensuing trial, a jury found defendant guilty as charged, and the State sought the death penalty. Defendant waived his right to a jury for the subsequent sentence hearing, and the circuit court ultimately found him eligible for the death penalty. However, citing defendant's lack of a prior violent criminal history, the court declined to impose the sentence of death and ordered defendant imprisoned for the rest of his life without the possibility of parole. Defendant also received a 30-year prison term for the attempted murder conviction, to run concurrently. Defendant now seeks review of these proceedings.

We affirm.

At trial, Luis Pagan recounted the events which unfolded at 2:20 p.m., at his grocery store, located at 4894 North Ashland Avenue on March 4, 1988. At that time, Pagan and Miguel Rivera were alone in the store when two men entered. The taller of the two men, whom Pagan identified as defendant, asked where the potato chips were located. The other, unidentified man stood near the counter while defendant walked around the store. Defendant eventually walked to the potato chip rack where Rivera was standing.

Pagan then heard a "commotion" and, turning, saw defendant grab Rivera by the collar and put a gun to his back. Pagan tried to push the alarm button to call police, but defendant pointed the gun at him and threatened him not to move. Defendant then brought Rivera to the counter, raised the gun to Rivera's left temple, and demanded money from both men. Rivera gave defendant his wallet, from which defendant removed all the money. Defendant asked for Pagan's wallet, but became angry when he found it empty. He pushed the gun into Pagan's back and repeated his demand for money. When defendant told Pagan that he was going to kill him, Pagan gave defendant his money and opened the cash register. Defendant pushed Pagan from the register and took the money out himself.

After emptying the register drawer of its cash, defendant returned the gun to Rivera's temple and demanded more money from the men. Pagan gave defendant some money which he had managed to keep hidden. Defendant told Pagan to turn around, and the unidentified man told defendant to "kill the motherfuckers and let's get out of here." As Pagan was turning around, he heard a shot and saw Rivera fall to the ground. Smiling, defendant turned to Pagan and said, "now you're next motherfucker." Defendant put the gun to Pagan's face and pulled the trigger. Pagan heard a "click" then grabbed defendant's hand and smashed his arm down against the counter and the cash register. Defendant let go of the gun, and Pagan retrieved it. Pagan attempted to fire a shot at defendant, but he "just heard a click." Defendant pushed Pagan, and Pagan fell behind the counter. Defendant fled from the store, running south toward Lawrence Avenue. Pagan pushed the police alarm button and gave chase, following defendant through an empty lot near the store. Pagan fired a shot toward defendant, but defendant was not hit and was able to make a getaway.

When Pagan returned to the store, he found Rivera dead. Eventually, police arrived at the scene, and Pagan described the gunman as a black male, 6 feet or taller, between 25 and 30 years of age. He wore a blue jacket with a red sweater underneath it and a blue and white

cap with the words "Raising hell in Wisconsin" printed across the top. Pagan recalled that shortly after 3 p.m., a police car pulled in front of the store, and officers told him that they had a man they wanted him to see. Defendant was in the back seat of the squad car, leaning aside "trying to hide his face." Pagan identified defendant as the gunman.

Michael King was leaving his brother's home near Pagan's store at 2:20 p.m. when he saw three black men walking through a gangway between Paulina and Ashland Avenues. Two of the men were short, and the other, whom King identified as defendant, was over 6 feet, wearing a blue jacket and brown corduroy pants. King, at that point entered his car, and pulled out of the gangway, turning at the intersection of Ainslie and Ashland Avenues. There, he saw one of the three men he had seen in the gangway standing in front of Pagan's store. When King arrived at his home, he heard a report on his police radio "scanner" that Pagan's store had just been robbed. King then walked back to the scene and told one of the officers that he had seen three men coming through the gangway. King took the officers to the gangway, and they toured the area, but could not find any of the suspects. As King was returning to the crime scene, he saw defendant being transferred from a squad car to a police paddy wagon. King turned to a plainclothes officer standing near him and identified defendant as one of the three men he had seen in the gangway just prior to the robbery.

Defendant was taken to the scene by Chicago police officer Robert Slupski, who, as part of the police manhunt for the homicide offenders, was touring a nearby department store. While Slupski was in the store, he received a report regarding the detention of a shoplifting suspect by the store's security personnel. Upon arriving at the security office, Slupski noted that defendant, the shoplifting suspect, matched the description of the gunman. He notified those at the scene that he was bringing a possible suspect back for identification. Slupski removed the handcuffs the store's officials had put on defendant and recuffed him with his own handcuffs. As soon as he put the cuffs on defendant, defendant complained of wrist pain. When Slupski asked defendant how he had hurt his wrist, defendant replied that he did not know and that he had "just hurt it." Slupski then took defendant to the homicide scene, where Pagan identified him as the gunman.

Katherine Gardet, a security officer at Sears Roebuck and Company, located at 1900 West Lawrence Avenue, testified that, as she was monitoring the store's security cameras, she saw defendant enter the store "really fast" at approximately 2:40 p.m. After she "lost

him" on the camera, Gardet took an escalator to the first floor, where she saw defendant enter the luggage department and take a garment bag. Defendant attempted, unsuccessfully, to exit from the store's emergency doors. Gardet continued to follow defendant as he tried to exit the store. With the help of another security officer, Gardet took defendant to the security office. Defendant was "resistant" at first, but later cooperated with Gardet and the other officer. While in the security office, defendant was handcuffed, and he complained to Gardet that the cuffs were too tight. However, Gardet "knew that they weren't" and called the police. Officer Slupski responded to her call, and the remainder of Gardet's testimony was substantially similar to that of Slupski.

Assistant State's Attorney Chris Cummings spoke with defendant at Area 6 Headquarters (Area 6). After initially denying his involvement in the shooting, defendant confessed that he and two "acquaintances" decided to rob the grocery store. Defendant maintained that the owner of the store and a customer struggled with defendant over defendant's gun and that the gun "somehow" "went off" during the struggle. After the gun was fired, defendant "somehow" hurt his right hand, dropped the gun, and ran out of the store. As defendant was running away, he heard a shot from behind him. Defendant ran to Sears, where he was arrested for shoplifting. Defendant agreed to provide Cummings with a transcribed statement, which was substantially similar to his oral statement.

Dr. Shaku Teas, an assistant Cook County medical examiner, testified that her autopsy findings indicated Rivera was killed by a gunshot wound to the left temple. The amount of gunpowder and soot around the wound indicated that the gun was very close to Rivera's head and was "probably touching his skin" when the shot was fired.

It was defendant's testimony that, on the afternoon of the shooting, he was to meet his girlfriend at a bakery located at 1701 West Foster Avenue. Defendant, who lived on the south side, took the "CTA" to Lawrence Avenue, where he transferred to a bus. Defendant arrived on the north side too early to meet his girlfriend so, to pass the time, he went into a Sears store, located four to five blocks from the bakery. While in the store, defendant decided to steal a garment bag, but was apprehended by a store security officer and taken to the security office, where he was questioned. Officer Slupski later came to the office and told defendant that he matched the description of a robbery suspect. Defendant recalled being taken to the scene of the shooting where Pagan identified him as the gunman. Defendant

was transported to Area 6 and placed in an interview room, where he repeatedly denied any involvement in the shooting.

Defendant maintained throughout his trial testimony that he never confessed to the crime, but merely "went along" with police who told him that, if he "cooperated," he could "help" himself. According to defendant, Officer Kajari related all the details of the crime to him. Furthermore, Kajari spent 40 to 50 minutes alone with defendant, "writing things down" on a piece of paper. Kajari left the room when defendant said he did not want to talk. Later, Kajari was joined by two assistant State's Attorneys who questioned defendant. Defendant told them that he had no knowledge of the crime and that he only knew what Kajari had told him. Kajari then left the room, followed by the two assistant State's Attorneys. Assistant State's Attorney Cummings returned with a piece of paper which he claimed Kajari had given him. Cummings told defendant that Kajari said that he had taken down defendant's "oral statement," in which defendant described the shooting as being unintentional. Defendant told Cummings that he had not implicated himself in that manner, but that it was Kajari who had, in fact, "suggested" the scenario to defendant. Cummings merely replied that Kajari would swear in court that defendant had provided him with the statement. Defendant eventually "went along" with the statement because he was "instructed" by Cummings that by "going along with" the story that had been "conceived" by Kajari, defendant would be "more believable."

The State presented the testimony of Sergeant Frank Kajari in rebuttal. Kajari stated that he, along with his partner, Robert O'Leary, advised defendant of his *Miranda* rights, and then had a 20-minute conversation with him. During their conversation, Kajari noticed that defendant's hands were bruised, and he asked defendant how his hands had become bruised. Defendant replied that he hurt himself while "body punching" a friend. When Kajari asked for the friend's name, defendant stated that he did not know. Kajari left the room, but returned later. He spoke with defendant for 10 minutes and left when defendant told him that he wanted to "think" and asked him to leave. Kajari denied that he had suggested a story for defendant to tell the assistant State's Attorneys. Kajari also denied telling defendant specific facts about the crime in order to do "himself a favor."

I

Defendant first contends that the admission of his involuntary

statement, after he exercised his right to remain silent, violated the fifth amendment.

Admission of defendant's statement was supported by the testimony of Kajari and Cummings. Kajari testified that he and his partner, O'Leary, read defendant his *Miranda* rights which defendant indicated he understood. After defendant agreed to speak with them, the officers had a 15- to 20-minute conversation with him. Kajari told defendant that Pagan had struggled with the gunman who, as a result, wounded his hand. Kajari pointed to defendant's wound on his hand and asked how he had received it. Defendant told him he had gotten hurt while "body punching" a friend. Following that conversation, a technician from the police crime lab entered the interview room and performed a "gunshot residue test" upon defendant's hands. At 4:40 p.m., Kajari reentered the interview room alone for approximately 5 to 10 minutes. At that time, defendant told Kajari that he wanted "to clear his mind, to think." Kajari left the room. He did not see defendant again until 7:20 p.m., when he accompanied two assistant State's Attorneys into the interview room. Cummings introduced himself and his partner, David Lavin, and recited *Miranda* warnings, which defendant again stated he understood. They proceeded to have a 20-minute conversation with defendant. They later reentered the room, but Kajari left after approximately one minute. Defendant never once indicated that he wished to remain silent.

Cummings testified that he and Lavin arrived at Area 6 at 5:20 p.m. and spoke with Pagan, Kajari, O'Leary, and a security official from Sears. At 7:45 p.m., Cummings, accompanied by Kajari, introduced himself and Lavin to defendant and explained that they were not his attorneys. Cummings advised defendant of his *Miranda* warnings, which defendant indicated he understood. Cummings asked defendant if he wished to speak to them, and defendant replied that he did. During this conversation, defendant kept repeating that he "was sorry." After a 30-minute conversation, in which defendant denied his involvement in the robbery and homicide, they left the room. After 15 minutes, the three returned to the room, and Cummings asked defendant why he was sorry. At that point, defendant asked if Kajari could leave the room because he wanted to talk to Cummings and Lavin privately. Kajari then left the room, and defendant proceeded to implicate himself in the shooting. Cummings stated that at no time did defendant ever say he did not wish to speak to them. Defendant never asked for a lawyer and never told either Cummings or Lavin that the details he knew were related to him by police.

Following this conversation, Cummings asked defendant if he would be willing to give a transcribed statement, to which defendant agreed. A stenographer was called, and defendant later gave a statement similar to his oral statement. After the statement was typed, defendant was given the opportunity to review it. Defendant initialled and signed the statement, indicating that it was correct.

Defendant testified that he was taken to an interview room where Kajari and O'Leary asked him questions concerning the robbery and shooting. Defendant denied having any knowledge of the crimes. Kajari told defendant that he was "facing alot of time" and that, by cooperating with police, defendant could "get out of the pen in time to apply for social security." The detectives left the room after 45 minutes, and a residue test on defendant's hands was performed by a police technician. The detectives then returned to the room and asked defendant about his two "accomplices." Again, defendant was told that he was in "alot of trouble" and that the best way to "help himself" was to cooperate. Defendant told Kajari that he did not want to talk to him, but Kajari continued to ask the same questions. Defendant told him to leave. Shortly thereafter, two detectives from another precinct came into the room and asked defendant about a double murder on 69th Street and Ashland Avenue.

When Cummings came into the interview room, he had with him a piece of paper that Kajari had told Cummings contained defendant's oral account of the shooting. Cummings had this paper with him when defendant's statement was taken, and Cummings referred to it during the session. Defendant further maintained that Cummings never read him his rights prior to taking the statement. In fact, defendant, on cross-examination, continued to insist that his *Miranda* rights were not given to him until the prosecutor impeached him with a copy of the transcript, which indicated that Cummings commenced the session with a recitation of the *Miranda* warnings.

The trial judge, in denying defendant's motion, specifically stated that he "can't believe the defendant." The court noted, in particular, defendant's denial that *Miranda* warnings were given and his subsequent impeachment with the transcript itself.

Defendant argues here that although he may not have expressly communicated to Kajari that he wanted to exercise his right to remain silent, his request that Kajari leave the room was an exercise of his fifth amendment right not to incriminate himself which should have been "scrupulously honored."

In *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (*Miranda*), the United States Supreme Court held that if,

during custodial interrogation, an "individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. *** [A]ny statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." *Miranda*, 384 U.S. at 473-74, 16 L. Ed. 2d at 723, 86 S. Ct. at 1627-28.

The Supreme Court, however, has rejected a *per se* proscription on the renewal of questioning by the police following a defendant's initial request to remain silent. (*Michigan v. Mosley* (1975), 423 U.S. 96, 46 L. Ed. 2d 313, 96 S. Ct. 321 (*Mosley*).) The Court has held that statements made by a suspect when he had earlier expressed a desire to remain silent are admissible if police "scrupulously honor" the suspect's right to "cut off questioning." (*Mosley*, 423 U.S. at 104, 46 L. Ed. 2d at 321, 96 S. Ct. at 326.) In *Mosley,* the defendant invoked his right to remain silent in connection with his arrest for a string of robberies. The defendant, during later questioning by officers regarding an unrelated murder, implicated himself. The Court concluded that the police had scrupulously honored the defendant's request because officers immediately ceased the initial interrogation and resumed questioning only after passage of a significant period of time and with the provision of a fresh set of *Miranda* warnings. *Mosley*, 423 U.S. at 106, 46 L. Ed. 2d at 322, 96 S. Ct. at 327.

In Illinois, our supreme court has held that a suspect's right to remain silent can be "scrupulously honored" even where a defendant is later requestioned regarding the same offense for which he previously invoked his right to silence. (*People v. Foster* (1987), 119 Ill. 2d 69, 518 N.E.2d 82, *cert. denied* (1988), 486 U.S. 1047, 100 L. Ed. 2d 628, 108 S. Ct. 2044, *reh'g denied* (1988), 487 U.S. 1246, 101 L. Ed. 2d 957, 109 S. Ct. 5. See also *People v. Reyes* (1989), 181 Ill. App. 3d 246, 536 N.E.2d 990, *appeal denied* (1989), 127 Ill. 2d 634, 545 N.E.2d 125.) In *People v. Foster*, the defendant was questioned by police at 6:30 a.m. During the conversation, the defendant stated, "I have got nothing to say." (*People v. Foster*, 119 Ill. 2d at 86.) At 9:30 a.m., an assistant State's Attorney advised the defendant of his *Miranda* warnings and proceeded to tell the defendant that a witness had given police a statement which implicated him in the murder. The defendant reacted by stating that he understood his rights and proceeded to tell authorities of his involvement in the murder. After giving the oral statement, the defendant signed a confession in which he waived his rights under *Miranda,* including the right to remain silent, and signed a typed confession. *People v. Foster*, 119 Ill. 2d at 86.

Thus, the resumption of questioning regarding the same offense is immaterial in determining whether police scrupulously honored defendant's right to keep silent. The relevant inquiry, in considering the admissibility of a statement given after an initial refusal to speak, is whether there was a significant period of time between defendant's exercise of his right to remain silent and the requestioning, whether that requestioning was preceded by *Miranda* warnings, and whether the interrogation was conducted by a different officer. (*People v. Reyes*, 181 Ill. App. 3d at 255.) Furthermore, the determination concerning the voluntariness of defendant's statement must be made with regard to the totality of the circumstances. *People v. Reyes*, 181 Ill. App. 3d at 255.

In the present case, we question whether defendant's statement "I need to think about it" was tantamount to an invocation of the right to remain silent. The police could plausibly construe such a statement as an invitation to speak with defendant at a later time. In any event, the record indicates that police scrupulously honored defendant's ambiguous request. Kajari testified that defendant asked "to think" at 4:40 p.m. Defendant was then left alone until Kajari, Cummings, and Lavin went to speak with him at 7:20 p.m.[1] This 2-hour and 40-minute interval between questioning was significant. (See *People v. Reyes*, 181 Ill. App. 3d at 256 (55-minute interval held significant); *People v. Young* (1983), 115 Ill. App. 3d 455, 450 N.E.2d 947 (75-minute interval held significant); *People v. Ferguson* (1981), 102 Ill. App. 3d 702, 429 N.E.2d 1321, *cert. denied* (1982), 459 U.S. 872, 74 L. Ed. 2d 133, 103 S. Ct. 159 (50-minute interval held significant); *People v. Pleasant* (1980), 88 Ill. App. 3d 984, 411 N.E.2d 132 (90-minute interval held significant).) Defendant, from that point in time, never stated that he wished to remain silent although he was told that he had that right. Like the situation in *People v. Foster*, the transcript of defendant's statement reveals that defendant waived his *Miranda* rights, including his right to remain silent, initialled, and signed the statement. Finally, Cummings conducted the subsequent interrogations of defendant, and although Kajari was present during one of the sessions, he did not ask defendant any questions. In fact, when defendant asked to speak to Cummings and Lavin privately, Kajari left the room in accordance with defendant's wishes.

---

[1]Cummings testified that this interview commenced at 7:45 p.m. Kajari stated that he brought Lavin and Cummings to the room at 7:20 p.m.

■ Under these circumstances, we cannot agree with defendant's assertions that his inquisitors did not scrupulously honor his right to remain silent and that they engaged in repeated efforts to wear down his resistance. Indeed, the trial judge explicitly stated that he did not believe that any "overbearing" occurred and, noting that defendant was impeached with his own signed statement, resolved credibility questions against defendant, whom the trial judge stated he "can't believe." It is the function of the trial judge to determine matters of credibility, and his findings with regard to voluntariness will not be disturbed upon review unless they are contrary to the manifest weight of the evidence. (*People v. Reyes*, 181 Ill. App. 3d at 257.) The findings here were not against the manifest weight of the evidence, and defendant's fifth amendment rights were not violated.

## II

Defendant next maintains that he was denied his sixth amendment right to effective assistance of counsel because his trial counsel failed to use, as substantive evidence, a prior inconsistent statement allegedly made by the victim Pagan.

Generally, in order to establish ineffective assistance of counsel, a defendant must show both that counsel's representation fell below an objective standard of reasonableness and that a reasonable probability exists that, but for the error, the result of the trial would have been different. (*Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.) A defendant bears a heavy burden to overcome the strong presumption in favor of a finding that defense counsel's advocacy was not ineffective. (*People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246, *cert. denied* (1985), 471 U.S. 1044, 85 L. Ed. 2d 335, 105 S. Ct. 2061.) Further, the determination of the reasonableness of trial counsel's actions must be evaluated from counsel's perspective at the time of the alleged error, without hindsight, in light of the totality of the circumstances. *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.

Defendant's claim of ineffectiveness centers on the portion of Pagan's direct testimony in which Pagan stated that defendant, after shooting Rivera, turned to Pagan, put the gun to his head, and pulled the trigger. When the gun misfired, Pagan asserted that he grabbed defendant's arm, and the men struggled for control of the gun. During Pagan's cross-examination, defense counsel asked the following:

"Q. Now when you spoke with Officer Czworniak at the scene on March 4, 1988, did you tell him that after the first

shot was fired, you grabbed the gun and that a struggle ensued and then you were able to seize control of the gun?

A. Yes, sir.

Q. Did you ever tell that police officer that the man with the gun pulled the trigger, it didn't go off when it was pointed at your face? Did you ever tell that to that police officer?

A. That I can't remember if I did or not.

\* \* \*

Q. Did you tell Detective Cole that the offender with the gun then came towards you, smiled, put the gun in your face, pulled the trigger, it didn't go off and you grabbed the gun?

A. That's right.

Q. You told him that?

A. That's right."

Chicago police officer Mark Czworniak, one of the first officers on the scene, later testified that he briefly interviewed Pagan, who gave him a description of the gunman. During his cross-examination, defense counsel asked Czworniak whether Pagan had told him that, after the first shot was fired, "the gunman stuck the gun in his face and pulled the trigger, but it didn't go off." Czworniak replied that he could not "recall if [Pagan] had mentioned that to [him]." Czworniak then noted that such a statement was not mentioned in his report. Detective Jon Cole testified that Pagan related to him the facts that defendant put the gun to Pagan's head and pulled the trigger, that the gun misfired, and that the men subsequently fought for control of the gun.

■ Defendant correctly notes that, in Illinois, a prior inconsistent statement made by a witness is a recognized basis for impeachment (*People v. Henry* (1970), 47 Ill. 2d 312, 265 N.E.2d 876) and, in some cases, may be recognized as substantive evidence. (Ill. Rev. Stat. 1987, ch. 38, par. 115—10.1.) However, Pagan's possible lack of outcry to Czworniak cannot reasonably be considered a prior inconsistent statement. That is because Czworniak's recollection of his questioning of Pagan at the scene did not, in any way, contradict Pagan's trial testimony. Pagan stated that he related the details of the attempted shooting to Cole, and Cole corroborated this. Additionally, we note that defense counsel argued Pagan's lack of initial outcry to Czworniak to the jury, insinuating that, after such an encounter, Pagan's silence was incredulous. Based on this record, defendant has failed to meet his burden in establishing an inefffective assistance of counsel claim.

### III

Defendant next maintains that he was denied due process when, during cross-examination, the prosecutor questioned him regarding his failure to protest his innocence after Pagan identified him as the gunman. Furthermore, defendant argues, the prosecutor emphasized defendant's silence in his closing argument.

Defendant failed to object to either the question or the comment during the trial. Defendant's post-trial motion also failed to identify either the question or the comment as error. Our supreme court has held repeatedly that the failure to raise an objection at trial and the failure to identify an issue as error in the post-trial motion preclude appellate review of the alleged error. (*People v. Pasch* (1992), 152 Ill. 2d 133, 604 N.E.2d 294; *People v. Turner* (1989), 128 Ill. 2d 540, 539 N.E.2d 1196, *cert. denied* (1989), 493 U.S. 939, 107 L. Ed. 2d 326, 110 S. Ct. 337; *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274.) The defendant concedes his waiver, but argues that this court should consider his claim under the "plain error" doctrine. This exception to the waiver rule allows a reviewing court to take notice of any improperly preserved error if the evidence is closely balanced or if the error affects substantial rights. See 134 Ill. 2d R. 615(a); *People v. Herrett* (1990), 137 Ill. 2d 195, 561 N.E.2d 1; *People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233.

A defendant's post-arrest silence may not be used to impeach an exculpatory story told for the first time at trial. (*Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240; *People v. Pegram* (1988), 124 Ill. 2d 166, 529 N.E.2d 506; *People v. Beller* (1979), 74 Ill. 2d 514, 386 N.E.2d 857.) The State may, however, comment permissibly on post-arrest silence if the defendant, at trial, falsely claims that he also gave his exculpatory statement to the police at the time of arrest. (*People v. Rehbein* (1978), 74 Ill. 2d 435, 386 N.E.2d 39, *cert. denied* (1979), 442 U.S. 919, 61 L. Ed. 2d 287, 99 S. Ct. 2843.) Additionally, if defendant's exculpatory trial testimony is manifestly inconsistent with the statements he made after his arrest, the comment on or evidence of his failure to give the same statement at that time will not violate the *Doyle* rule. (*People v. Beller*, 74 Ill. 2d at 522-23.) Neither exception to the *Doyle* rule is applicable to the facts presented here. Accordingly, the prosecutor committed error in both questioning and commenting upon defendant's lack of outcry at the time Pagan identified him as the gunman.

■ Having concluded that the question and comment were improper, we must now determine whether this waived error may be excused under the plain error doctrine. The evidence detailed above cannot be regarded as closely balanced. Defendant was arrested in the vicinity of the grocery store within one-half hour of the shooting, and his clothing and appearance matched the gunman's description that was provided to the police by the surviving victim and another witness. Defendant's hand alsó bore a wound similar to that suffered by the gunman. Pagan and King both positively identified defendant. Additionally, defendant's credibility was damaged when his alibi trial testimony was impeached by his own confession. In light of these facts, defendant's waiver cannot be excused under the first prong of the exception. Moreover, our supreme court has held that, although this error involves constitutional rights, it is "not of such a character that the second prong of the plain error rule must be invoked to preserve the integrity and reputation of the judicial process." (*People v. Herrett*, 137 Ill. 2d at 215.) Indeed, comment on defendant's post-arrest silence, while improper, is not an error of such magnitude as to clearly deprive defendant of a fair trial. (*People v. Nitz* (1991), 143 Ill. 2d 82, 572 N.E.2d 895, *cert. denied* (1991), 502 U.S. 927, 116 L. Ed. 2d 283, 112 S. Ct. 344; *People v. Herrett*, 137 Ill. 2d at 215.) The plain error rule is considered by our courts to be a limited exception to the waiver doctrine, an exception which should not and cannot be used as a "general savings clause" for preserving all errors affecting rights which were not brought to the circuit court's attention during the course of the trial. (*People v. Herrett*, 137 Ill. 2d at 215-16. See also *People v. Carlson*, 79 Ill. 2d 564, 404 N.E. 2d 233.) Defendant, therefore, is precluded from asserting the error as a ground for reversal.

## IV

Defendant also claims error as a result of the testimony of Chicago police technician Thomas Ginnelly, who defendant asserts was unqualified to render such testimony.

Ginnelly testified that he had worked in the Chicago police mobile crime laboratory for 19 years and that his duties included processing and photographing crime scenes, dusting for fingerprints, recovering physical evidence, marking that evidence, and sending it to the proper laboratories. During direct examination, Ginnelly testified that he had found no usable fingerprints during his dusting of the grocery store. Defense counsel, on cross-examination, asked Ginnelly if he had performed any tests upon defendant. Ginnelly responded that he per-

formed a gunshot residue test on defendant at Area 6. Ginnelly described the procedure, which entails swabbing the subject's hands with an acidic solution and then bringing the swabs to the laboratory for analysis. In this case, Ginnelly did not perform the analysis, because he does not have that "expertise." On redirect examination, the prosecutor asked Ginnelly whether gunshot residue would be visible to the naked eye. Ginnelly responded that it would not. Ginnelly stated that, as a technician, the "guidelines" for conducting the residue test require that the test must be performed upon a living person, within six hours of the alleged shooting. The test cannot be conducted if the subject had been fingerprinted or had washed his hands. The swab is later tested for the presence of barium, antimony, and copper or lead, depending upon the bullet. The prosecutor then asked Ginnelly about the bullets he had found at the grocery store. Examining them, Ginnelly stated that the "multiple indents on the edge of the rim indicat[ed] that someone had attempted to fire" the bullets. During recross-examination, Ginnelly admitted that he did not have the expertise in "firearms identification" to determine whether the murder weapon was capable of misfiring.

Defendant failed to raise an objection to this testimony at trial and failed to include the issue in his written post-trial motion. As a result, the issue is precluded from review upon appeal. (*People v. Enoch*, 122 Ill. 2d 176, 522 N.E. 2d 1124.) Defendant admits that he failed to preserve the issue and invites this court to examine the issue under the plain error doctrine. Before we can invoke that doctrine, however, we must determine whether error occurred at all. *People v. Wade* (1989), 131 Ill. 2d 370, 546 N.E.2d 553.

In Illinois, expert testimony is admissible when the subject matter is sufficiently beyond the common experience of ordinary lay individuals such that only persons of a particular skill or experience are capable of forming a judgment based on the facts presented. (*People v. Gloster* (1980), 89 Ill. App. 3d 250, 411 N.E.2d 891.) The degree and manner of knowledge and experience required of the expert are related to the complexity of the subject (*People v. Columbo* (1983), 118 Ill. App. 3d 882, 455 N.E.2d 733, *cert. denied* (1984), 467 U.S. 1208, 81 L. Ed. 2d 351, 104 S. Ct. 2394), and the burden of establishing these qualifications rests upon the proponent of the subject testimony. (*People v. Park* (1978), 72 Ill. 2d 203, 380 N.E.2d 795.) On review, the circuit court's determination of the adequacy of qualifications, for conferring expert status, will not be disturbed absent a clear abuse of discretion. *People v. Free* (1983), 94 Ill. 2d 378, 447 N.E.2d 218, *cert. denied* (1983), 464 U.S. 865, 78 L. Ed. 2d 175, 104 S. Ct. 200.

■ A review of Ginnelly's testimony reveals that defendant is correct in asserting that Ginnelly was unqualified to render an opinion as to the condition of the recovered bullets. However, as noted above, defense counsel diffused whatever impact this testimony may have had by eliciting from Ginnelly that he was not an expert in firearm identifications and that he did not know whether the gun was capable of being misfired. Additionally, Ginnelly's lack of expertise was brought out by defense counsel during his initial cross-examination. For these reasons, we do not believe the complained-of error falls within either prong of the plain error exception. As we have indicated in our previous discussion, the evidence here cannot reasonably be considered as closely balanced. Moreover, the error did not clearly deprive defendant of a fair trial. Defendant's waiver, therefore, may not be excused, and he is precluded from asserting the claim as a basis for reversal.

V

Defendant's final claim of error concerns the propriety of several remarks made by the prosecutor during closing argument.

Three of the comments cited by defendant as improper are waived due to defendant's failure to object to the comments at trial and his failure to identify them specifically in his post-trial motion. (See *People v. Enoch*, 122 Ill. 2d at 186; *People v. Thomas* (1984), 121 Ill. App. 3d 883, 460 N.E.2d 402.) Moreover, we find no reason to excuse that waiver under the plain error exception.

We preface our discussion of defendant's remaining argument regarding improper prosecutorial comment by noting that, generally, a prosecutor is allowed a great deal of latitude in making the closing argument, and the circuit court's determination of the propriety of the argument will not be disturbed absent a clear abuse of discretion. (*People v. Cisewski* (1987), 118 Ill. 2d 163, 514 N.E.2d 970.) Improper remarks are the basis of reversal only when they result in substantial prejudice to the defendant. (*People v. Piscotti* (1985), 136 Ill. App. 3d 420, 483 N.E.2d 363.) Furthermore, a defendant may not assert such prejudice where the comments of which he complains were provoked or invited by the arguments of his counsel. *People v. Piscotti*, 136 Ill. App. 3d 420, 483 N.E.2d 363.

Defendant identifies as improper the following remarks made by the prosecutor:

> "Counsel says you know he's making it up about the gun being pointed at his face and click. What did Judge Hett tell you when he came in? What did he get charged with that night? At-

tempt first degree murder. He knowingly attempted to kill Luis Pagan. Where did that come up all of a sudden when he's charged with that from day one?

DEFENSE COUNSEL'S OBJECTION: He wasn't charged with that from day one.

THE COURT: Overruled. This is argument.

PROSECUTOR: How did that—that just didn't pop up today or when you were picked as jurors, that charge."

■ Assuming that the comment was improper, this error was cured by the circuit court's instruction to the jury that the indictment was "not any evidence against the defendant and does not create any inference of guilt." We further note that the jury was informed that closing arguments were not evidence. See *People v. Stiff* (1989), 185 Ill. App. 3d 751, 542 N.E.2d 392.

Defendant next claims the following as error:

"Counsel says isn't this amazing he's not talking, so they leave the room after a half an hour and give him time to think and come back in. Why did you do that? Because if you don't do that, if the question is from the defense attorneys, you didn't even—

DEFENSE COUNSEL: Objection to what the question would be.

THE COURT: Overruled. This is argument.

ASSISTANT STATE'S ATTORNEY: If they don't leave the room and give him a chance it's going to be relentlessly bearing down on my client and intimidating. If you leave the room for half an hour and give him a break, no, you stood there two hours questioning him, You overbore his will. That's what defense attorneys want to do. They want to have their cake and eat it too just like he went to pick up his girlfriend at Let Them Eat Cake."

Even if we were to assume that this comment was improper, we cannot conclude that the remark had so strong an impact on the jury so as to constitute a material factor in the determinations of guilt reached by the jury especially in light of the overall argument, the evidence adduced, and the circuit court's instruction to the jury that closing arguments were not evidence. See *People v. Stiff*, 185 Ill. App. 3d 751, 542 N.E. 2d 392; *People v. Tannahill* (1987), 152 Ill. App. 3d 882, 504 N.E.2d 1283, *appeal denied* (1987), 115 Ill. 2d 549, 511 N.E.2d 436.

Defendant further argues that the cumulative nature of the preceding errors denied him a fair trial, and he invites this court to grant him a new trial.

■■ As noted above, Pagan's testimony was clear and convincing, and it established that defendant came into the store, brandished a gun, demanded and took money from both Pagan and Rivera, and shot Rivera in the head. Pagan's description of Rivera's shooting was corroborated by the medical evidence, and Pagan's description of the offender was consistent with the description provided by King, who had seen defendant just prior to entering the grocery store. Pagan stated that the gunman fled south, and defendant, indeed, was apprehended at a Sears store located just south of the scene within 30 minutes of the shooting. Given the convincing nature of the State's evidence, we hold that the alleged errors, whether viewed individually or cumulatively, were harmless beyond a reasonable doubt. See *People v. Hopkins* (1982), 107 Ill. App. 3d 422, 437 N.E.2d 722.

Defendant's convictions and sentences, therefore, are affirmed.

Affirmed.

CAMPBELL and BUCKLEY, JJ., concur.