UNITED STATES of America ex rel.
Antonio BALDERAS, Petitioner,

v.

Salvador GODINEZ,[1] Respondent.

No. 94 C 3150.

United States District Court,
N.D. Illinois,
Eastern Division.

June 21, 1995.

---

**1.** After this action was brought (on August 10, 1994), Richard Gramley succeeded original respondent Godinez as petitioner Balderas' custodian—Godinez had been Warden of Stateville Correctional Center, while Gramley is Warden of Pontiac Correctional Center in Pontiac, Illinois, where Balderas is now in custody. Although that change would ordinarily call for a substitution of respondents, that step is unnecessary in light of the dismissal ordered here.

Sheldon Nagelberg, for petitioner.

Nancy L. Graver, Asst. Atty. Gen., for respondent.

### MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Antonio Balderas ("Balderas") has filed a 28 U.S.C. § 2254 ("Section 2254") petition for writ of habeas corpus ("Petition"). Balderas challenges his 1989 convictions for murder, attempt murder and armed robbery, for which he is now serving a sentence of life imprisonment without possibility of parole and a concurrent 30 year prison term.[2] For the reasons stated in this memorandum opinion and order, Balderas' Petition is denied and this action is dismissed.

### Facts

■ Section 2254(d) makes the Illinois Appellate Court's findings of fact presumptively correct as long as they are made after a hearing on the merits and are fairly supported by the record (*Armstrong v. Young*, 34 F.3d 421, 426 (7th Cir.1994)). It is plain that the statement of facts in the Illinois Appellate Court opinion (*People v. Balderas*, 241 Ill.App.3d 845, 847–850, 182 Ill.Dec. 402, 405–07, 609 N.E.2d 936, 939–41 (1st Dist. 1993)) indeed fairly reflects the record. This Court therefore accepts that summary:

> At trial, Luis Pagan recounted the events which unfolded at 2:20 p.m., at his grocery store, located at 4894 North Ashland Avenue on March 4, 1988. At that time, Pagan and Miguel Rivera were alone in the store when two men entered. The taller of the two men, whom Pagan identified as defendant, asked where the potato chips were located. The other unidentified man stood near the counter while defendant walked around the store. Defendant eventually walked to the potato chip rack where Rivera was standing.
>
> Pagan then heard a "commotion" and, turning, saw defendant grab Rivera by the collar and put a gun to his back. Pagan tried to push the alarm button to call police, but defendant pointed the gun at him and threatened him not to move. Defendant then brought Rivera to the counter, raised the gun to Rivera's left temple, and demanded money from both men. Rivera gave defendant his wallet, from which defendant removed all the money. Defendant asked for Pagan's wallet, but became angry when he found it empty. He pushed the gun into Pagan's back and repeated his demand for money. When defendant told Pagan that he was going to kill him, Pagan gave defendant his money

---

2. Since Balderas' conviction the crime of murder has been reclassified as first degree murder (720 ILCS 5/9–1(a)(1) and (2)). This opinion will follow the parties' usage in referring to the crime simply by its former label of murder. Criminal attempt is now defined at 720 ILCS 5/8–4, while armed robbery now appears at 720 ILCS 5/18–2.

and opened the cash register. Defendant pushed Pagan from the register and took the money out himself.

After emptying the register draw [sic] of its cash, defendant returned the gun to Rivera's temple and demanded more money from the men. Pagan gave defendant some money which he had managed to keep hidden. Defendant told Pagan to turn around, and the unidentified man told defendant to "kill the motherfuckers and let's get out of here." As Pagan was turning around, he heard a shot and saw Rivera fall to the ground. Smiling, defendant turned to Pagan and said, "now you're next motherfucker." Defendant put the gun to Pagan's face and pulled the trigger. Pagan heard a "click" then grabbed defendant's hand and smashed his arm down against the counter and the cash register. Defendant let go of the gun, and Pagan retrieved it. Pagan attempted to fire a shot at defendant, but he "just heard a click." Defendant pushed Pagan, and Pagan fell behind the counter. Defendant fled from the store, running south toward Lawrence Avenue. Pagan pushed the police alarm button and gave chase, following defendant through an empty lot near the store. Pagan fired a shot toward defendant, but defendant was not hit and was able to make a getaway.

When Pagan returned to the store, he found Rivera dead. Eventually, police arrived at the scene, and Pagan described the gunman as a black male, six feet or taller, between 25 and 30 years of age. He wore a blue jacket with a red sweater underneath it and a blue and white cap with the words "Raising hell in Wisconsin" printed across the top. Pagan recalled that shortly after 3 p.m., a police car pulled in front of the store, and officers told him that they had a man they wanted him to see. Defendant was in the back seat of the squad car, leaning aside "trying to hide his face." Pagan identified defendant as the gunman.

Michael King was leaving his brother's home near Pagan's store at 2:20 p.m. when he saw three black men walking through a gangway between Paulina and Ashland Avenues. Two of the men were short, and the other, whom King identified as defendant, was over six feet, wearing a blue jacket and brown corduroy pants. King, at that point entered his car, and pulled out of the gangway, turning at the intersection of Ainslie and Ashland Avenues. There, he saw one of the three men he had seen in the gangway standing in front of Pagan's store. When King arrived at his home, he heard a report on his police radio "scanner" that Pagan's store had just been robbed. King then walked back to the scene and told one of the officers that he had seen three men coming through the gangway. King took the officers to the gangway, and they toured the area, but could not find any of the suspects. As King was returning to the crime scene, he saw defendant being transferred from a squad car to a police paddy wagon. King turned to a plain clothes officer standing near him and identified defendant as one of the three men he had seen in the gangway just prior to the robbery.

Defendant was taken to the scene by Chicago police officer Robert Slupski, who, as part of the police manhunt for the homicide offenders, was touring a nearby department store. While Slupski was in the store, he received a report regarding the detention of a shoplifting suspect by the store's security personnel. Upon arriving at the security office, Slupski noted that defendant, the shoplifting suspect, matched the description of the gunman. He notified those at the scene that he was bringing a possible suspect back for identification. Slupski removed the handcuffs the store's officials had put on defendant and recuffed him with his own handcuffs. As soon as he put the cuffs on defendant, defendant complained of wrist pain. When Slupski asked defendant how he had hurt his wrist, defendant replied that he did not know and that he had "just hurt it." Slupski then took defendant to the homicide scene where Pagan identified him as the gunman.

Katherine Gardet, a security officer at Sears Roebuck and Company, located at 1900 West Lawrence Avenue, testified that, as she was monitoring the store's

security cameras, she saw defendant enter the store "really fast" at approximately 2:40 p.m. After she "lost him" on the camera, Gardet took an escalator to the first floor where she saw defendant enter the luggage department and take a garment bag. Defendant attempted, unsuccessfully, to exit from the store's emergency doors. Gardet continued to follow defendant as he tried to exit the store. With the help of another security officer, Gardet took defendant to the security office. Defendant was "resistant" at first, but later cooperated with Gardet and the other officer. While in the security office, defendant was handcuffed, and he complained to Gardet that the cuffs were too tight. However, Gardet "knew that they weren't" and called the police. Officer Slupski responded to her call, and the remainder of Gardet's testimony was substantially similar to that of Slupski.

Assistant State's Attorney Chris Cummings [("Cummings")] spoke with defendant at Area 6 Headquarters (Area 6). After initially denying his involvement in the shooting, defendant confessed that he and two "acquaintances" decided to rob the grocery store. Defendant maintained that the owner of the store and a customer struggled with defendant over defendant's gun and that the gun "somehow" "went off" during the struggle. After the gun was fired, defendant "somehow" hurt his right hand, dropped the gun, and ran out of the store. As defendant was running away, he heard a shot from behind him. Defendant ran to Sears, where he was arrested for shoplifting. Defendant agreed to provide Cummings with a transcribed statement, which was substantially similar to his oral statement.

Dr. Shaku Teas, an assistant Cook County medical examiner, testified that her autopsy findings indicated Rivera was killed by a gunshot wound to the left temple. The amount of gunpowder and soot around the wound indicated that the gun was very close to Rivera's head and was "probably touching his skin" when the shot was fired. It was defendant's testimony that, on the afternoon of the shooting, he was to meet his girlfriend at a bakery located at 1701 West Foster Avenue. Defendant, who lived on the south side, took the "CTA" to Lawrence Avenue, where he transferred to a bus. Defendant arrived on the north side too early to meet his girlfriend so, to pass the time, he went into a Sears store, located four to five blocks from the bakery. While in the store, defendant decided to steal a garment bag, but was apprehended by a store security officer and taken to the security office, where he was questioned. Officer Slupski later came to the office and told defendant that he matched the description of a robbery suspect. Defendant recalled being taken to the scene of the shooting where Pagan identified him as the gunman. Defendant was transported to Area 6 and placed in an interview room, where he repeatedly denied any involvement in the shooting.

Importantly for purposes of Section 2254(d), the Appellate Court credited not only Pagan's "clear and convincing" testimony and King's corroborative testimony, but also "the convincing nature of the State's evidence" (241 Ill.App.3d at 862, 182 Ill.Dec. at 414–15, 609 N.E.2d at 948–49). Finally, to the extent that other portions of the trial record need to be mentioned in the course of resolving the matter, they will be referred to as needed in this opinion.

*Procedural History*

After he was convicted on all counts in the indictment, Balderas filed a post-trial motion. When the trial court denied that motion, Balderas appealed to the Illinois Appellate Court, where his convictions were affirmed (241 Ill.App.3d 845, 182 Ill.Dec. 402, 609 N.E.2d 936). Next the Illinois Supreme Court denied his petition for leave to appeal (151 Ill.2d 567, 616 N.E.2d 338 (1993)). Finally Balderas sought relief under the Illinois Post–Conviction Hearing Act (725 ILCS 5/122–1 through 122–7). It is significant in terms of the later analysis in this opinion that only one issue raised in that post-conviction petition coincided with any issue advanced in the current Petition: the question whether the post-arrest interrogation of Balderas violated his Fifth Amendment

rights.[3] After the Circuit Court dismissed Balderas' post-conviction petition as frivolous, the Illinois Appellate Court affirmed, and he did not seek further review by the Illinois Supreme Court within the required time period (Ill.Sup.Ct.R. 315(b)).

While all of this was going on, Balderas had filed his original Section 2254 petition (in Case No. 93 C 6546), and this Court initially granted him leave to proceed in forma pauperis. But when the Illinois Attorney General pointed out that Balderas then had a state court appeal pending, this Court dismissed that original petition because of Balderas' failure to exhaust his state remedies 1993 WL 558736 (1993 U.S.Dist. LEXIS 18711 (N.D.Ill.Dec. 21)).

Balderas then tried again with his current self-prepared Petition. This effort survived the threshold scrutiny called for by *Denton v. Hernandez*, 504 U.S. 25, 32–33, 112 S.Ct. 1728, 1733, 118 L.Ed.2d 340 (1992), and this Court appointed Sheldon Nagelberg, Esq. to act as Balderas' counsel on a pro bono publico basis. Although Balderas had initially failed to exhaust his state court remedies (his appeal from the post-conviction petition dismissal was still pending), the Appellate Court's July 11, 1994 affirmance of that dismissal eliminated that barrier. With all state remedies now having been exhausted, the case is ripe for decision.

### Balderas' Federal Claims

■ Before this Court Balderas asserts that six errors committed during his trial violated three federal constitutional provisions. According to Balderas:

1. Investigators infringed his Fifth Amendment rights when they continued to interrogate him even after he invoked his right to remain silent.

2. Balderas' Sixth Amendment right to counsel was violated by the failures of (a) his trial counsel either to introduce as substantive evidence an inconsistent statement by a prosecution witnesses or to preserve that issue for appeal and (b) his appellate counsel to argue that same inconsistency on appeal.

3. Prosecutors violated Balderas' Fourteenth Amendment right to due process of law when they (a) referred during the trial to his post-arrest silence,[4] (b) offered testimony of a police lab technician as that of an expert without first establishing the witness as such and (c) engaged in misconduct on five occasions during closing argument.

### Procedural Default

#### Legal Standards

■ Before any federal court can address the merits of a Section 2254 petition, the petitioner must have both exhausted his state remedies and avoided any procedural defaults (*Lostutter v. Peters*, 50 F.3d 392, 394 (7th Cir.1995)). Claims are exhausted when they have been presented to the highest available state court for a ruling on the merits or when state remedies are no longer available (*Farrell v. Lane*, 939 F.2d 409, 410 (7th Cir.1991)). Because it is clear from the already-stated procedural history that no non-exhaustion problem exists here, however, this opinion focuses instead on the separate doctrine of procedural default.

■ While "[e]xhaustion refers only to issues that have not been presented to the

---

3. As always, this memorandum opinion and order adheres to the conventional and convenient (though technically imprecise) practice of referring to the underlying Bill of Rights Provision (which of course imposes limitations only on the federal government) rather than to the Fourteenth Amendment (which applies to state actors and has been construed to embody Bill of Rights guaranties).

4. Balderas' Petition 7 might also be read to include a first-time claim that the prosecutor's questions violated Balderas' Fifth Amendment right against self-incrimination:

The State incorrectly procured defendant to become a witness against himself by using the guise of supposedly [sic] asking a harmless question which induced defendant to speak as a witness against himself.

Because Balderas offers no explanation for his failure to assert that self-incrimination argument earlier in state court, this Court cannot decide the issue for the first time on Section 2254 review (*Verdin v. O'Leary*, 972 F.2d 1467, 1472–73 (7th Cir.1992)).

738

state court but still may be presented" (*Resnover v. Pearson*, 965 F.2d 1453, 1458 (7th Cir.1992)), procedural default occurs either (1) when a state court has declined to address a prisoner's federal claims because the prisoner failed to meet an independent and adequate state procedural requirement (*Coleman v. Thompson*, 501 U.S. 722, 729–30, 111 S.Ct. 2546, 2554, 115 L.Ed.2d 640 (1991)) or (2) when a claim that *could* have been but was not brought before a state court[5] can no longer be asserted in that forum (*Resnover*, 965 F.2d at 1458). That second scenario might occur in one of two ways (see *United States ex rel. Sumner v. Washington*, 840 F.Supp. 562, 568–69 (N.D.Ill.1993)):

1. Petitioner may have failed to pursue all of the appeals required under state law in a timely manner (*Coleman*, 501 U.S. at 735 n. 1, 111 S.Ct. at 2557 n. 1; *Jenkins v. Gramley*, 8 F.3d 505, 507 (7th Cir.1993)).

2. Petitioner may have diligently pursued all the appeals required by state law, yet failed to raise at the state level the federal claims later asserted in the federal habeas petition (*Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 2506, 53 L.Ed.2d 594 (1977); *Resnover*, 965 F.2d at 1458).

■ Federal law determines the level of specificity with which a claim must be asserted in state court to be preserved, but state law determines whether a claim must be asserted in the first instance and how far that claim must be pursued to avoid procedural default (*Sumner*, 840 F.Supp. at 569 and cases cited there). Under Illinois law a claim that could have been asserted on direct appeal but was not is considered waived—it can not be revisited in any later direct or collateral proceeding, even where petitioner's constitutional rights are at stake (*id.* at 569 & n. 8, collecting cases). That rule applies with equal force in collateral proceedings. Indeed, Illinois post-conviction review is limited to constitutional matters that were not and could not have been previously adjudicated (*People v. Gosier*, 165 Ill.2d 16, 20, 208 Ill.Dec. 308, 310, 649 N.E.2d 364, 366 (1995)).

■ Once barred on procedural default grounds, a claim will not be cognizable in a federal habeas proceeding unless the petitioner can clear one of two hurdles established by *Coleman*, 501 U.S. at 750, 111 S.Ct. at 2565:

We now make it explicit: In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.[6]

Thus it is necessary at the outset to determine which if any of Balderas' claims are procedurally defaulted and whether Balderas may avoid the procedural bar to any such claims by demonstrating either cause and prejudice or a fundamental miscarriage of justice.

*Balderas' Efforts To Obtain State Court Relief*

In response to the Petition the Illinois Attorney General has raised issues of proce-

5. For that purpose the petitioner must have "fairly presented" his claim to the state court (*Picard v. Connor*, 404 U.S. 270, 275–76, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971)). Factors to be considered in that determination are listed in *United States ex rel. Sullivan v. Fairman*, 731 F.2d 450, 454 (7th Cir.1984)), but as a practical matter the petitioner will not be required to cite "book and verse on the federal constitution" to present a constitutional claim (*Picard*, 404 U.S. at 278, 92 S.Ct. at 513)—instead the ultimate inquiry is "whether the state court was sufficiently alerted to the federal constitutional nature of the issue to permit it to resolve that issue on a federal basis" (*Verdin*, 972 F.2d at 1476).

6. [Footnote by this Court] Though the quoted language does not say so specifically, the *Coleman* rule of limited exceptions to procedural default clearly applies not only to state decisions resting on independent and adequate state procedural rules, but also to instances where a claim was never brought before a state court in the first instance (*Jenkins*, 8 F.3d at 507–08):

[A] defendant who neglects to present his claims to the state court at all, and thereby denies it the opportunity to assert a forfeiture rule, has surrendered them just as surely as if he presents them in a procedurally defective manner.

See also *Coleman*, 501 U.S. at 735 n. 1, 111 S.Ct. at 2557 n. 1.

dural default as to all but one of the six issues outlined above. Balderas' five claims other than his Fifth Amendment claim are therefore first considered from that perspective.

■ Following his post-trial motion and his unsuccessful first-level appeal from his conviction, Balderas sought leave to appeal to the Illinois Supreme Court with the aid of a Deputy Public Defender. That petition was ultimately denied, but more important for present purposes is the fact that Balderas relied on just a single issue in support of his petition—the denial of his Fifth Amendment rights (Resp.Ex. G at 3). Nowhere in his petition for leave to appeal did Balderas advance any of the five remaining issues sought to be pressed upon this Court in the current Petition. Because Balderas thus never presented those issues to the Illinois Supreme Court, he has procedurally defaulted on all five (*Mason v. Gramley*, 9 F.3d 1345, 1348 (7th Cir.1993)).[7] That is not the end of the story, of course—it remains to consider the possibility that Balderas might have established cause and prejudice, as required by *Coleman* to avoid procedural default, in the two instances where Balderas so argues.

In that respect this Court will accord Balderas' submissions the liberal construction counseled by *U.S. ex rel. Jones v. Franzen*, 676 F.2d 261, 266 (1982).[8] So read, the Petition seeks to demonstrate that the requisite cause and prejudice showing has been met as to the claimed ineffectiveness of his trial counsel because Balderas should be forgiven the failure to assert such ineffectiveness in his petition for leave to appeal to the Illinois Supreme Court[9] (Petition 6):

Furthermore both trial counsel and appellate counsel[10] failed to recognize this error

or object too [sic] it or preserve it for future relief or consideration. . . .

■ To be sure, the ineffective assistance of counsel, in addition to constituting a claim that may be included in a habeas petition, may itself constitute "cause" for default under *Coleman* (*Barnhill v. Flannigan*, 42 F.3d 1074, 1078 (7th Cir.1994), citing *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986)). But in this instance Balderas' claim must fail for a fundamental reason.

■ Where a defendant has no constitutional right to counsel in the first instance, that defendant cannot complain that any claimed deprivation of the effective assistance of counsel has constitutional dimensions (*Coleman*, 501 U.S. at 752, 111 S.Ct. at 2566; *Buelow v. Dickey*, 847 F.2d 420, 426 (7th Cir.1988), quoting *Wainwright v. Torna*, 455 U.S. 586, 587–88, 102 S.Ct. 1300, 1301, 71 L.Ed.2d 475 (1982)). And apart from the right to take a first appeal on the merits, defendants do not have a constitutional right to counsel in their attempts to pursue discretionary state appeals (*United States ex rel. Simmons v. Gramley*, 915 F.2d 1128, 1136–37 (7th Cir.1990), citing *Ross v. Moffitt*, 417 U.S. 600, 610, 94 S.Ct. 2437, 2443, 41 L.Ed.2d 341 (1974)). In Illinois all petitions for leave to appeal are discretionary appeals (Ill.Sup. Ct.R. 315(a); *People v. Powell*, 72 Ill.2d 50, 60, 18 Ill.Dec. 318, 322, 377 N.E.2d 803, 807 (1978)). Balderas must therefore "bear the risk of attorney error that results in a procedural default" (*Coleman*, 501 U.S. at 752–53, 111 S.Ct. at 2566).

Moreover, it would seem that Balderas could not prevail even if this Court were to reach the merits of his claim. It appears

---

7. See Appendix.

8. *Franzen* literally speaks only to the liberal standards accorded to pro se filings. Nonetheless it seems appropriate to apply that standard here, where appointed counsel has chosen not to alter or augment Balderas' filings in any way save to submit a claim borrowed almost word for word from the earlier appeal to the Illinois Appellate Court (Resp.Ex. E at 50–57).

9. Before the Appellate Court, Balderas' ineffective assistance argument was unquestionably advanced under the Sixth Amendment (Resp. Ex. E at 33, citing *Strickland v. Washington*, 466 U.S. 668, 685, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984)).

10. [Footnote by this Court] It will be assumed in light of the hurdle sought to be cleared by Balderas that his reference to "appellate counsel" refers to the Deputy Public Defender with whom he worked to prepare his petition for leave to appeal to the Illinois Supreme Court.

most likely that Balderas' appellate counsel (who had presented *all* of Balderas' contentions to the Appellate Court in a 62–page brief) simply chose the issue that he believed was most likely to strike a responsive chord and secure one of the infrequent Illinois Supreme Court's grants of leave to appeal (*Smith v. Murray,* 477 U.S. 527, 536, 106 S.Ct. 2661, 2667, 91 L.Ed.2d 434 (1986) (citation omitted)):

> This process of "winnowing out weaker arguments on appeal and focusing on" those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy.

What has just been said is strongly supported by the internal evidence (a comparison of the brief on appeal and the later petition for leave to appeal). That issue need not be explored further, however, because of the fatal flaw that has been identified in the preceding paragraph.

■ Finally and relatedly, even if Balderas were able to contend that what appears to be a strategic judgment by his well-qualified and articulate appellate counsel were rather a constitutionally deficient level of assistance, he would *still* be treated as having failed to establish legal cause on the issue. That is so because Balderas failed to tender the issue in his self-prepared petition when he later attempted to obtain post-conviction relief (*Williams v. Duckworth,* 724 F.2d 1439, 1442–43 (7th Cir.1984)). That reflects a total failure to satisfy the "cause" prong of the cause-and-prejudice test (*id.* at 1443), and it thus further buttresses this opinion's already-stated rejection of this ground for relief.

There is a second instance in which Balderas suggests a cause for his procedural de-fault—that concerning his allegations of prosecutorial misconduct.[11] Balderas claims a violation of the Due Process Clause when the prosecutor made five prejudicial comments during closing argument: (1) that the jury would have to find that the surviving victim was part of a police conspiracy before it could acquit Balderas, (2) that the jury should believe police witnesses because of their status as police officers and prosecutors, (3) that Balderas was charged with attempt murder from "day one"—a fact not in evidence, (4) that the jury could consider Balderas' status as a defendant in judging his credibility and (5) that defense tactics were subject to attack, although in fact defense counsel had made no improper arguments.

■ Balderas suggests that his failure to preserve the misconduct issues that the Appellate Court deemed to have been waived should nonetheless be considered here under plain error doctrine. But that misses the point that any argument by Balderas that the Appellate Court was wrong in holding that three of his claims were waived should have been brought first to the Illinois Supreme Court—for "a collateral challenge may not do service for an appeal" (*United States v. Frady,* 456 U.S. 152, 165, 102 S.Ct. 1584, 1593, 71 L.Ed.2d 816 (1982)). Balderas must thus overcome his procedural default before this Court may consider those claims. And in that regard "plain error" is not the appropriate standard—*Coleman,* 501 U.S. at 750, 111 S.Ct. at 2565 teaches that Balderas must instead demonstrate either (1) cause for the default, coupled with actual prejudice as a result of the alleged federal violation, or (2) a fundamental miscarriage of justice. He has shown neither.[12]

---

**11.** Though the Attorney General makes no mention of it (and thereby waives the argument, cf. *Barrera v. Young,* 794 F.2d 1264, 1269 (7th Cir. 1986)), it is not clear that the Illinois courts have ever been fairly presented with Balderas' prosecutorial misconduct argument under the *federal* Constitution—Balderas cited to no federal authority in his brief on appeal (see Resp.Ex. E at 50–61), nor did the Illinois Appellate Court cite to federal cases in resolving those issues that had not been waived (241 Ill.App.3d at 860–62, 182 Ill.Dec. at 413–15, 609 N.E.2d at 947–49). Balderas would therefore be procedurally barred from cutting a new federal claim from the cloth of his prior state claim had the argument been raised by respondent (*Verdin,* 972 F.2d at 1473, quoting *Nadworny v. Fair,* 872 F.2d 1093, 1096 (1st Cir.1989)):

> Although the federal courts, other conditions being met, will ultimately salve state error of constitutional dimension, the state must first be accorded the opportunity to protect the federally assured interests of its criminal defendants.

**12.** Construed broadly, Balderas' claim of plain error might be read as a contention that the

### Balderas' Fifth Amendment Claim

Balderas is thus left with just one potentially viable federal claim: his contention that the admission into evidence of his assertedly involuntary statement to authorities violated the Fifth Amendment because that statement was elicited after he had invoked his right to remain silent. He pursued that claim on appeal to the Appellate Court, where it was rejected under the authority of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). And he renewed the claim in his unsuccessful petition for leave to appeal to the Illinois Supreme Court (Resp.Ex. G at 3). Hence the issue is now ripe for this Court's resolution on the merits.

Here is what Balderas says in Petition at 5–6, copied verbatim:

Whether admission of involuntary statements taken from defendant after exercise of his right to remain silent violated the fifth amendment. Whether defendants exercise of his right to remain silent was scrupulously honored when he was re-interrogated involving same offense after he denied involvement several times but was continuously questioned. The state finds the issue of defendants re-interrogation immaterial in determinating rather defendants rights we're violated under the fifth amendment. The Appellate Court affirmed the decision in this case, which defendant fines to be in direct violation of his fifth amendment rights. This court should grant relief in favor of petitioner because the Appellate Court finds it is immaterial to the determination of whether a defendant's exercise of his right to remain silent was scrupulously honored that the defendant was later requestioned regarding the same offense.

That argument brings into play the familiar principles announced in *Miranda* and explicated in its numerous progeny.

*Miranda,* 384 U.S. at 473–74, 86 S.Ct. at 1627–28 established that a suspect subject to custodial interrogation may terminate questioning at any time. Where the suspect invokes his right to remain silent, *Miranda, id.* (footnote omitted) stated a bright-line rule:

If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise.

But *Mosley,* 423 U.S. at 102, 96 S.Ct. at 326 later backed off from a literal interpretation of the quoted passage, finding that strict adherence to its language "would lead to absurd and unintended results"—in part because any suspect who had once invoked his or her right to silence could never again be subjected to custodial interrogation. At the same time *Mosley, id.* also found the other extreme equally unpalatable:

To permit the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purposes of *Miranda* by allowing repeated rounds of questioning to undermine the will of the person being questioned.

As a middle ground *Mosley, id.* at 104, 96 S.Ct. at 326 held that the focus should be on whether a suspect's right to remain silent had been "scrupulously honored." In that case the question was answered in the affirmative because (1) the police had immediately ceased interrogating the suspect upon his invocation of the right to remain silent, (2) they resumed questioning only after a reasonable amount of time (over two hours), (3) the suspect was then provided with a fresh set of warnings before being re-interrogated and (4) the second interrogation concerned a crime that had not been a subject of the earlier interrogation (*id.* at 104–07).

 This Court agrees with the Appellate Court's decision that Balderas' rights were "scrupulously honored" as required by

---

second of the *Coleman* alternatives should apply here—that is, an argument that his is the kind of "extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent" (*Murray,* 477 U.S. at 496, 106 S.Ct. at 2649). Consideration of that possibility is deferred until later.

*Mosley.* Each *Mosley* consideration is best treated in turn, although this Court is of course mindful that the "ultimate question" whether the challenged confession was "obtained in a manner compatible with the requirements of the Constitution" depends upon "the totality of the circumstances" (*Miller v. Fenton*, 474 U.S. 104, 112, 106 S.Ct. 445, 450, 88 L.Ed.2d 405 (1985)).

■ As for Balderas' invocation of his right to remain silent, he testified that he told Officer Kajari that he "didn't want to talk to them anywhere" (Trial Transcript ("Tr.") 769). For his part, Kajari remembered Balderas saying that "he wanted to clear his head, he wanted to think" (Tr. 55). While the Appellate Court noted that Balderas' statement was somewhat ambiguous,[13] it went on to find that Kajari did indeed leave Balderas alone at that point (241 Ill.App.3d at 854, 182 Ill.Dec. at 409, 609 N.E.2d at 943)—a conclusion supported by the testimony of both Balderas and Kajari (Tr. 769, 55).

Next as to the time that elapsed between Kajari's exit and the time of his return with State's Attorneys Cummings and David Lavin ("Lavin") to resume questioning, that period of delay between interrogations was clearly reasonable. Kajari left Balderas at about 4:50 p.m. and testified that he returned with Cummings and Lavin at 7:20 p.m., though Cummings remembered that to have taken place at 7:45 p.m. Even if Kajari's testimony is credited over that of Cummings (as did the Appellate Court), that amounts to a delay of 2 hours and 30 minutes, more than the two-hour interval that *Mosley*, 423 U.S.

at 106, 96 S.Ct. at 327 held constituted "the passage of a significant period of time." In light of the totality of the circumstances in which Balderas first claimed the right to remain silent and then waived that right before giving his statement to police, this Court finds that the over-two-hour delay between interrogations was a significant period of time (see, e.g., *Hatley v. Lockhart*, 990 F.2d 1070, 1074 (8th Cir.1993) (two hours sufficient); *United States v. Nash*, 910 F.2d 749, 752 (11th Cir.1990) ("over one hour" sufficient)), especially given the lack of a coercive environment during that period (see *D'Antoni*, 856 F.2d at 981–82).[14]

Next, the renewed giving of *Miranda* warnings—the "crucial factor" that has sometimes been referred to as the single most important of the items discussed in *Mosley* (*United States v. Hsu*, 852 F.2d 407, 411 (9th Cir.1988))—also supports the admissibility of Balderas' statement. At the conclusion of the suppression hearing the trial court held that the "defendant was at all times given his *Miranda* warnings" (Tr. 172).[15] Indeed, Balderas conceded at trial that after the delay following his invocation of his right to remain silent, he was once more apprised of his *Miranda* rights by State's Attorney Cummings before he gave his statement (Tr. 144). Finally, while he denied having been given his rights *during* the statement, Balderas initialed each page and signed the last page of the court-reported statement in which he acknowledged that he was aware of his right to remain silent

---

**13.** Balderas need not have employed "any special combination of words" to invoke his right to silence (*Bobo v. Kolb*, 969 F.2d 391, 396 (7th Cir.1992), quoting *Quinn v. United States*, 349 U.S. 155, 162, 75 S.Ct. 668, 672, 99 L.Ed. 964 (1955)). As *United States v. D'Antoni*, 856 F.2d 975, 980 (7th Cir.1988) put it:

> Even an equivocal indication of the desire to remain silent can suffice to invoke *Miranda*'s requirement that interrogation cease.

In any event, this Court (like the Appellate Court) will assume for the sake of argument that Balderas' comment to Kajari invoked his right to silence, particularly in light of the ultimate determination reached here that Balderas' rights were thereafter scrupulously honored.

**14.** This finding of the lengthy delay between interrogations would be suspect if, as Balderas

maintained, two other detectives had entered the interview room to interrogate him about another double murder. But the Appellate Court, after reviewing Balderas' testimony on that score, discredited it in light of the trial court's finding that Balderas could not be believed (Tr. 172). That finding is entitled to deference (*Bobo*, 969 F.2d at 397).

**15.** Although such a prior understanding does not of course control, Balderas conceded not only that Kajari had informed him of his rights when the two first met at Area 6 (Tr. 131), but also that even before Kajari informed him of those rights he "basically" understood them and did in fact know that he had the right to remain silent (Tr. 131).

(Tr. 146, 148). After looking at all the facts, the Appellate Court deferred to the trial court's determination that Balderas could not be believed (Tr. 172). This Court will do likewise, for the factual finding of a state appellate court is owed the same deference as the factual findings of a state trial court (*Bobo,* 969 F.2d at 397)).

Just a moment should be spent to discuss the fact that it was Kajari who had first questioned Balderas at Area 6 and also Kajari who returned with Cummings and Lavin for the second interrogation. It might perhaps be argued that, unlike the situation in *Mosley,* the presence of the same officer during both interrogations violated Balderas' constitutional rights because that presence intensified the pressures of a custodial proceeding that was already presumptively coercive.

▄▄▄▄ But a second interrogation is not rendered unconstitutional merely because one of the officers present conducted an earlier interrogation (see *Grooms v. Keeney,* 826 F.2d 883, 885–86 (9th Cir.1987)). Instead the central inquiry is whether Balderas' confession was truly voluntary. On that score *United States v. Haddon,* 927 F.2d 942, 945–46 (7th Cir.1991) (citations omitted) teaches:

> The "test for a voluntary confession is 'whether the defendant's will was overborne at the time he confessed.'" Accordingly, coercive police activity is a "necessary predicate" to a determination that a confession was not voluntarily made.

And while the ultimate question of voluntariness "is a question of law requiring independent federal determination" (*Ray v. Duckworth,* 881 F.2d 512, 517 (7th Cir.1989), citing *Miller,* 474 U.S. at 112, 106 S.Ct. at 450), state court findings on subsidiary issues such as the "length and circumstances of the interrogation" are conclusive (*Miller,* 474 U.S. at 117, 106 S.Ct. at 453).

While Kajari did attend the second interrogation at its inception, the Appellate Court found that he asked no questions of Balderas and, more importantly, that he left the room when Balderas asked that he do so (241 Ill.App.3d at 854, 182 Ill.Dec. at 410, 609 N.E.2d at 944). That finding is consistent with the testimony of both Cummings (Tr. 106–12) and Balderas (Tr. 777) that Kajari had left the room *before* Balderas gave his court-reported statement. So Kajari's brief presence at the second interrogation cannot be said to have visited upon Balderas the kind of coercive pressure that was warned of in *Mosley.*

Finally, unlike the situation in *Mosley* the second interrogation here covered the same conduct sought to be investigated during the first interrogation—the convenience store crimes. That identity of subject matter could pose a potential problem in light of *Mosley*'s express reference (423 U.S. at 106, 96 S.Ct. at 327) to the fact that the successive interrogations in that case covered different crimes. Our Court of Appeals has not yet written on the question whether the *Mosley* "scrupulously honored" test may be met even where questioning resumes on the same crime after a suspect has expressed the wish to remain silent. However, other circuits have held that "a second interrogation is not rendered unconstitutional simply because it involves the same subject matter discussed during the first interview" (e.g., a series of Eighth Circuit decisions cited and followed in *Hatley,* 990 F.2d at 1074; *Grooms,* 826 F.2d at 885–86).

Consistently with the totality-of-the-circumstances standard taught in *Miller,* 474 U.S. at 112, 106 S.Ct. at 450, the lesson of those cases is that *Mosley* is not to be applied mechanically—that is, no single factor should dominate the inquiry into whether a suspect's rights were scrupulously honored. And an affirmative finding in that respect is warranted where as here the authorities neither refused to discontinue the interrogation upon request nor persisted in repeated efforts to wear down the suspect's resistance to make him change his mind (*Mosley,* 423 U.S. at 105–06, 96 S.Ct. at 327).

Thus the totality of the circumstances weighs heavily in favor of a finding that Balderas' Fifth Amendment rights were scrupulously honored, and this Court so holds. That renders moot Balderas' further challenge to the Illinois Appellate Court's determination that the circumstances of his interrogation were "immaterial." Neverthe-

less, that final contention will be considered (and is rejected) here for the sake of completeness.

*Brecht v. Abrahamson,* —— U.S. ——, ——, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993) (citations omitted) sets the hurdle that Balderas must clear in his attempt to avoid federal harmless error doctrine:

> The test ... is whether the error "had substantial and injurious effect or influence in determining the jury's verdict." Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in "actual prejudice."

Accord, *Tyson v. Trigg,* 50 F.3d 436, 446 (7th Cir.1995). Application of that standard thus "requires the habeas court to evaluate to some extent the probability of the outcome if the case were tried" without the asserted error (*Everette v. Roth,* 37 F.3d 257, 262 (7th Cir.1994)).

 Under the *Brecht* standard for harmless error review, this Court is satisfied that the overwhelming weight of the evidence presented against Balderas at trial rendered harmless any arguable error surrounding his interrogation (see *Brecht,* —— U.S. at ——, 113 S.Ct. at 1722; *United States v. Williams,* 33 F.3d 876, 879 (7th Cir.1994)). Though it should be repeated that no such constitutional error was committed, a brief recapitulation of that overwhelming evidence follows.

Pagan had an excellent opportunity to view his attacker—Pagan testified at trial that he was "just a couple of feet" away from his assailant when the latter first entered the convenience store (Tr. 441),[16] and the two men were even closer when the assailant came across the counter and pointed a gun at Pagan's face (Tr. 453–55). After the incident Pagan told the police that his attacker was six feet or taller, between the ages of 25 and 30, and dressed in a blue and white cap with "Raising hell in Wisconsin" printed on the front, a blue jacket and a red sweater (Tr. 461–62). Balderas matched that description—he still wore the jacket, red top and a blue and white cap—when he was arrested less than 30 minutes after the incident (Tr. 604). When police brought Balderas back to the convenience store in a squad car, Pagan was a "hundred percent sure" that Balderas was his attacker (Tr. 464–66) even though Balderas attempted to hide his face. Pagan's identification of Balderas was supported by that of Michael King, a bystander who had noticed Balderas in the area of the convenience store before the incident. Pagan also testified that the assailant ran south toward Lawrence Avenue when fleeing the convenience store (Tr. 459)—and Balderas was arrested in a Sears store that he had entered "really fast" just south of Pagan's location. Finally, Pagan smashed his attacker's right arm into the counter "four or five times" (Tr. 449, 453) in an effort to jar the gun loose after the misfire—and Balderas complained of pain in his right wrist when handcuffed by police at Sears (Tr. 606).

This Court's review of the entire trial transcript convinces it that even without the admission of Balderas' statement the jury would have believed beyond a reasonable doubt that Balderas was the gunman who robbed Pagan's store at gunpoint, killed Rivera and tried to kill Pagan. Balderas therefore suffered no "actual prejudice" from the admission of his confession, and any putative error was harmless.[17]

### Conclusion

Of the six claims that Balderas has tendered to this Court in his habeas Petition, five have been procedurally defaulted. Moreover, as to those five claims Balderas

---

**16.** References are made to the trial transcript only where the cited testimony does not appear in the Appellate Court opinion.

**17.** What has been said here also puts to rest any contention that a denial of the Petition would amount to "a fundamental miscarriage of justice" (*Coleman,* 501 U.S. at 750, 111 S.Ct. at 2565). *Schlup v. Delo,* —— U.S. ——, ——, 115

S.Ct. 851, 864, 130 L.Ed.2d 808 (1995) confirms that the "fundamental miscarriage" exception is limited to the "rare" situation in which "a constitutional violation has probably resulted in the conviction of one who is actually innocent" (quoting *Murray,* 477 U.S. at 496, 106 S.Ct. at 2649); accord, *Whitlock v. Godinez,* 51 F.3d 59, 63 (7th Cir.1995).

has failed to establish either (1) cause for his default, coupled with demonstrated prejudice, if his claim were not now adjudicated or (2) that a miscarriage of justice will flow from the application of a procedural bar. As to his sole surviving claim, Balderas loses on the merits: It is plain that his Fifth Amendment rights were not violated, because his right to remain silent was scrupulously honored. And even if this Court were somehow to have found otherwise in that respect, the Petition would still have to be denied in light of the overwhelming weight of the evidence against Balderas.

Balderas' Petition is accordingly denied, and this action is dismissed. Notification of this disposition is contemporaneously being transmitted to Balderas.

### APPENDIX

On several occasions the Attorney General's response to the Petition cites to the Illinois Appellate Court's reliance on waiver doctrine as lending cumulative support to the argument that Balderas had committed procedural default, thus precluding habeas relief here. While that issue is essentially rendered moot in light of Balderas' failure to have included the claims in his petition for leave to appeal to the Illinois Supreme Court (a clear procedural default in its own right), the Attorney General's waiver-based contention is so flawed in that respect that it should not go without comment.

It is true that the Illinois Appellate Court held (241 Ill.App.3d at 857, 182 Ill.Dec. at 411, 609 N.E.2d at 945, collecting authorities) that because Balderas had failed to object to the questions regarding his post-arrest silence during trial and had failed to raise the issue in his post-trial motion (see *People v. Balderas*, No. 89–2332, 1 *Common Law Proceedings* at 77–78), he had waived that issue. As the Attorney General would have it, the state court's waiver holding qualifies as an "independent and adequate state ground" for denying relief, as those terms are defined in *Tredway v. Farley*, 35 F.3d 288, 295 (7th Cir.1994) (per curiam).

But the Attorney General ignores the Appellate Court's conclusion (241 Ill.App.3d at 858, 182 Ill.Dec. at 412, 609 N.E.2d at 946) that the "plain error" doctrine was inapplicable as a basis for allowing Balderas to overcome that waiver. *Willis v. Aiken*, 8 F.3d 556 (7th Cir.1993) has recently revisited the question of when resort by a state appellate court to plain error doctrine following a finding of procedural default will alter the "independent and adequate" finding that would otherwise apply if plain error were never discussed. Adapted to this case, *Willis, id.* at 565–66 teaches (footnote omitted):

> After *Coleman*, we believe that the formalism of which we spoke in *Rogers–Bey* [*v. Lane*, 896 F.2d 279 (7th Cir.1990) ] is no longer the controlling factor. We also believe that, because it remains our duty "to determine the scope of the relevant state court judgment," it is permissible for us to examine the caselaw of [Illinois] to determine the function that the fundamental error doctrine plays in its appellate process. More precisely, we must determine whether its use can be said to amount to an expression of willingness on the part of the state to forgive an earlier procedural default and to rest its decision on the federal issue.

In Balderas' case, the Illinois Appellate Court did not state that it was relying *solely* on its finding of waiver, though it did go so far as to refer to Illinois plain error doctrine as an "exception to the waiver rule" that did not apply (241 Ill.App.3d at 857, 182 Ill.Dec. at 411, 609 N.E.2d at 945). But more importantly, the court expressed a willingness to allow Balderas to overcome Illinois waiver doctrine in the event that his *federal* rights had been violated—thus the court's entire discussion of Balderas' "substantial rights" made relevant by Illinois Supreme Court Rule 615(a) (241 Ill.App.3d at 857, 182 Ill. Dec. at 411, 609 N.E.2d at 945) focuses on whether the rule of *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) had been violated. Even the Illinois Supreme Court cases cited by the Appellate Court refer in turn to federal cases applying *Doyle* (see *People v. Rehbein*, 74 Ill.2d 435, 441–43, 24 Ill.Dec. 835, 838, 386 N.E.2d 39, 42 (1978); *People v. Beller*, 74 Ill.2d 514, 521–26, 25 Ill.Dec. 383, 386–88, 386 N.E.2d 857, 860–62 (1979)).

Thus because the Appellate Court fairly appeared to rest primarily on federal law in that regard, this Court might have reached the merits of Balderas' claim as to the admissibility of his post-arrest silence were it not for his failure to advance it before the Illinois Supreme Court first (compare these facts to those in *United States ex rel. Hartfield v. Gramley*, 853 F.Supp. 289, 293 (N.D.Ill.1994) and *United States ex rel. Johnson v. Gilmore*, 860 F.Supp. 1291, 1296–97 (N.D.Ill. 1994)). By way of contrast, the Appellate Court's later determination that there was no plain error in the admission of expert testimony against Balderas (241 Ill.App.3d at 859–60, 182 Ill.Dec. at 413, 609 N.E.2d at 947) rested solely on *state* law. And that court's similar finding as to the alleged prosecutorial misconduct during closing arguments (*id.*, 182 Ill.Dec. at 413–14, 609 N.E.2d at 947–48) cites to *no* authority, state or federal.